FILED
COURT OF APPEALS
DIVISION II

2014 SEP 30 AM 9: 21

STATE OF WASHINGTON

BY_____

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Domestic Partnership of: | No. 44289-2-II |
| JEAN M. WALSH, | |
| Appellant/Cross-Respondent, | |
| v. | |
| KATHRYN L. REYNOLDS, | PUBLISHED OPINION |
| Respondent/Cross-Appellant. | |

HUNT, J. — Jean M. Walsh appeals and Kathryn L. Reynolds cross-appeals the trial court's decree of dissolution of domestic partnership, challenging the court's findings of fact and conclusions of law. They argue that the trial court erred in (1) ruling that they had lived in an "equity relationship"[1] between January 1, 2005, and August 20, 2009; (2) ruling that they owned their Federal Way home as tenants in common; and (3) awarding each approximately 50 percent

---

[1] Washington courts recognize an "equity relationship" as a "'stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist.'" *In re Meretricious Relationship of Long*, 158 Wn. App. 919, 925, 244 P.3d 26 (2010) (quoting *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995)). Courts also refer to such an "equity relationship" as a "'committed intimate relationship'" or a "'meretricious relationship.'" *Long*, 158 Wn. App. at 922 (quoting *Olver v. Fowler*, 161 Wn.2d 655, 657 n.1, 168 P.3d 348 (2007)).

share of equity in the Federal Way home.[2] Walsh also appeals the trial court's award of attorney fees and costs to Reynolds.

We affirm the trial court's finding of an "equity relationship" between the parties for purposes of equitably allocating their community property in dissolving their registered domestic partnership. We reverse the trial court's finding that this "equity relationship" began only in 2005 and remand to the trial court to reconsider and to amend its finding about when the parties' "equity relationship" began and then to reassess its equitable distribution of community property based on this finding. We also affirm the trial court's award of attorney fees and costs to Reynolds, and we grant her attorney fees and costs on appeal.

## FACTS

### I. RELATIONSHIP

Jean Margaret Walsh is an orthopedic surgeon living in Pierce County. In 1986, she moved to Fresno, California, where she purchased a home with her personal savings. In 1987, she used additional personal savings to purchase a private medical practice.

In 1988, Walsh met Kathryn Reynolds. After dating for about three months, Reynolds moved into Walsh's Fresno home, but she paid no mortgage or utilities. Thereafter, Walsh and Reynolds lived together for 20 years but maintained separate bank accounts and financial

---

[2] Each party seeks a greater share of the assets than the trial court awarded. More specifically, Walsh argues that the trial court should have applied community property law more narrowly, i.e., only to assets acquired as of their Washington domestic partnership registration on August 20, 2009 (thereby decreasing the community assets available for distribution and leaving a greater share of assets as her separate property). Reynolds argues that the trial court should have applied community property law more expansively, i.e., to assets acquired from the beginning of the parties' relationship in California, 1988 (thereby increasing the community assets available for distribution and increasing her share of property).

records. Reynolds was then working for a hardware store; she later worked for a custom home builder.

Soon after Reynolds moved in with Walsh, they agreed that Walsh would pay Reynolds a salary for performing housekeeping at the home they shared. At Reynolds' request, Walsh fired her former housekeeper and hired Reynolds to perform the same work for the same pay. Walsh also made contributions to Reynolds' separate retirement account.

In 1989, Reynolds was laid off from her custom homebuilding job and returned to school at Fresno State University. Walsh paid Reynolds' tuition and other educational expenses; Reynolds completed her degree in 1993.

In 1992, Walsh gave birth to a daughter. Walsh paid Reynolds additional money for daycare services for her daughter. In early 1993, Reynolds moved out of Walsh's house, but Walsh continued to pay Reynolds for household and daycare services. A few months later, however, Reynolds moved back into Walsh's house. In December 1993, Reynolds adopted Walsh's daughter.

In 1996, Walsh gave birth to a son, whom Reynolds adopted in 1997. When Walsh was pregnant, she had decided to sell her private medical practice. The medical equipment sold for about $20,000.00. Walsh also sold for $131,766.22 one share of a local health management company, which she had acquired in 1987, the year before she met Reynolds. Walsh used these proceeds and a portion of her personal bank account to purchase a 20-acre eastern Fresno property in her own name. Walsh's income decreased significantly after she sold her practice, but she continued to pay Reynolds at the same rate as previously.

In 1998, Reynolds gave birth to a daughter, whom Walsh adopted in 2000. Walsh paid for all three adoptions, all the children's expenses, the entire mortgage, all utilities, and all other household expenses. When Reynolds paid for something for the children or for the household, she would request and receive reimbursement from Walsh. For purposes of buying household items, Walsh added Reynolds as an authorized user on Walsh's separate credit card in 2000; in 2007, Walsh added Reynolds as an authorized user on another separate credit card.

Between 1990 and 2011, Walsh paid Reynolds over $500,000. Walsh also paid off Reynolds' $7,500 credit card debt, which Reynolds later repaid to Walsh with a $500 monthly deduction from her daycare and housekeeping salary.

A. Registered Domestic Partners, California, 2000

On March 6, 2000, Walsh and Reynolds registered as domestic partners in California. That year, Walsh sold her eastern Fresno property and purchased a house in Tacoma, Washington, again in her own name. In June, Walsh and Reynolds moved to Washington, where Walsh found employment as an orthopedic surgeon.

Walsh and Reynolds continued their existing financial arrangement: Walsh paid the mortgage; health, dental, and auto insurance; the children's private school tuition; and other household expenses. Walsh also provided Reynolds with medical benefits by listing her as a domestic partner with her insurer, and continued to pay Reynolds an income. Walsh and Reynolds kept titles for their respective personal cars in their own names; title to the family car, however, was in both names.

In 2003, Walsh sold the Tacoma home and used the sale proceeds to purchase a home in Federal Way. This time, Walsh and Reynolds both signed the deed, which expressly stated that

they were "acquir[ing] all interest" in the property "as joint tenants with right of survivorship, and not as community property or as tenants in common." Clerk's Papers (CP) at 368. Walsh, however, took out a mortgage on the Federal Way property solely in her name; again, Reynolds made no financial contribution to the home's purchase or mortgage. Walsh also paid for all utilities, until the parties' 2012 dissolution.

### B. Registered Domestic Partners, Washington, 2009

In August 2009, Walsh and Reynolds registered as domestic partners in Washington. They separated seven months later on March 14, 2010.

## II. PROCEDURE: DOMESTIC PARTNERSHIP DISSOLUTION TRIAL

Walsh petitioned for dissolution on March 11, 2011. The parties agreed on a parenting plan and child support order for their 16- and 13-year-old children. Post separation and dissolution, Walsh continues to pay for over 92 percent of the private school tuition for their son and younger daughter and nearly all college tuition and costs for their older daughter. Collectively, the parties had amassed over $2 million in real property, retirement, and investment accounts at the time of the dissolution. Only property distribution and attorney fee issues remained for trial.

After a three-day trial, the trial court assessed the five *Long*[3] factors[4] as applied to Walsh and Reynolds' relationship and found that they had lived and held themselves out as family for almost 23 years, since 1988, when they began cohabiting in California. The trial court also noted that if these two people "were a heterosexual couple that had been cohabiting since 1988 . . . this Court would not hesitate to find that a meretricious or equity relationship existed for the 20 plus years prior to the date of the [formal statutory Washington] marriage." Suppl. CP at 412.

Nevertheless, the trial court concluded that (1) the parties had lived in an "equity relationship" beginning January 1, 2005,[5] until they registered as domestic partners under Washington's Domestic Partnership Act, chapter 26.60 RCW, in 2009; (2) therefore, the property the parties had acquired during this "equity relationship" period was subject to equitable distribution as if it were community property; and (3) the property the parties had obtained after their August 20, 2009 domestic partnership registration in Washington, but before their March 14, 2010 separation, was community property.

The trial court also (1) found that the parties owned the Federal Way residence as tenants in common; (2) ordered the residence sold; (3) awarded Walsh an initial $40,834.42 from the

---

[3] *In re Meretricious Relationship of Long*, 158 Wn. App. 919, 925, 244 P.3d 26 (2010).

[4] At least before our legislature promulgated statutes recognizing domestic partnership status and extending community property rights to such partnerships, Washington courts recognized a common law "equity relationship" in a "'stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist.'" *Long*, 158 Wn. App. at 925 (quoting *Connell*, 127 Wn.2d at 346). *Long* set forth a non-exclusive list of factors for courts to consider in determining whether an equity relationship exists between partners. *Long*, 158 Wn. App. at 925-26.

[5] The trial court ruled that it would be unconstitutional to find an equitable relationship existed before January 1, 2005, because neither California's nor Washington's registered domestic partnership laws vested Walsh and Reynolds with community property rights.

sale of the house for mortgage payments on the home before January 1, 2005[6]; and (3) divided

the remaining proceeds 51.89 percent to Walsh and 48.11 percent to Reynolds. The trial court

divided equally the remaining community property assets acquired between January 1, 2005, and

March 14, 2010. The trial court awarded Reynolds $35,117.50 in attorney fees[7] and $2,400.75 in

costs, but no maintenance.

Walsh appeals and Reynolds cross-appeals.

## ANALYSIS

Walsh argues that the trial court erred in ruling that (1) the "equity relationship" doctrine

applied to the parties' relationship *before* they registered as domestic partners in Washington on

August 20, 2009, namely in acknowledging a non-Washington-registered "equity relationship"

that began on January 1, 2005, when California amended its domestic partnership statute to

extend community property rights to registered domestic partners[8]; (2) assets the parties

accumulated during this "equity relationship," between January 1, 2005, and August 20, 2009,

were community property subject to distribution during the dissolution trial; and (3) the parties

held the Federal Way home as tenants in common, rather than as joint tenants with a right of

survivorship. Walsh further argues that the trial court erred in (4) distributing the proceeds of the

Federal Way house sale equally; and (5) awarding Reynolds attorney fees and costs. Except for

---

[6] The trial court also awarded Walsh $180,000 from her father's contributions and $30,000 from inherited funds used to pay down the mortgage before Walsh and Reynolds separated on March 2010.

[7] The trial court reduced Reynolds' requested attorney fee amount by $2,635 for time her attorney had spent familiarizing herself with Pierce County Local Rules, for discovery not in compliance with the local rules, and for a trial brief never submitted to the court.

[8] CAL. FAM. CODE § 297.5.

the trial court's finding that the parties' "equity relationship" began in 2005, we disagree with Walsh's contentions.

Reynolds cross-appeals, arguing that the trial court erred in (1) failing to characterize as joint assets the parties' assets accumulated before January 2005; (2) ruling that the parties' "equity relationship" commenced in January 2005, rather than in 1988; (3) ruling that Walsh and Reynolds held the Federal Way property as tenants in common; and (4) entering the decree of dissolution. We agree with Reynolds.

## I. STANDARD OF REVIEW

We review a trial court's property distribution to determine whether substantial evidence supports its findings of fact, and whether those findings support its conclusions of law. *In re Marriage of Pennington*, 142 Wn.2d. 592, 602-03, 14 P.3d 764 (2000). "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" *Gormley v. Robertson*, 120 Wn. App. 31, 38, 83 P.3d 1042 (2004) (quoting *Fred Hutchinson Cancer Research Ctr. v. Holman*, 107 Wn.2d 693, 712, 732 P.2d 974 (1987)). We defer to the trial court's factual findings. *Pennington*, 142 Wn.2d at 602-03. But we review its conclusions of law de novo. *Long*, 158 Wn. App. at 925.

We review for abuse of discretion the trial court's distribution of property at the end of an "equity relationship." *Long*, 158 Wn. App. at 928. Once the trial court finds an "equity relationship," the court distributes all property the parties acquired through their efforts during the "equity relationship." *Id*. To divide the property justly and equitably, the trial court examines the relationship and the parties' property accumulation. *Id*. at 928-29 (citing *In re Marriage of Lindsey*, 101 Wn.2d 299, 304, 678 P.2d 328 (1984)). The trial "court may

characterize property as 'separate' and 'community' by analogy to marital property." *Id.* at 929 (quoting *Connell v. Francisco*, 127 Wn.2d 339, 351, 898 P.2d 831 (1995)); *see* RCW 26.16.010-.030 (definitions of separate and community property).

But, unlike a marriage dissolution, where *all* property is before the court, only community property is before the trial court for distribution at the end of an "equity relationship." *Id.* at 929 (citing *Connell*, 127 Wn.2d at 351). Any increase in the "value of separate property is likewise separate in nature." *Id.* (citing *In re Marriage of Lindemann*, 92 Wn. App. 64, 69, 960 P.2d 966 (1998)). Nevertheless,

> "if the court is persuaded by direct and positive evidence that the increase in value of separate property is *attributable to community labor or funds*, the community may be equitably entitled to reimbursement for the contributions that caused the increase in value."

*Id.* (emphasis added) (quoting *Lindemann*, 92 Wn. App. at 70).

## II. COMMUNITY PROPERTY

Walsh and Reynolds had lived together since 1988, before formalizing their relationship by registering as domestic partners, first in California on March 6, 2000, and again in Washington on August 20, 2009. The trial court (1) characterized the parties' relationship as an "equity relationship"[9] between the 2005 amendment to California's Domestic Partnership Act and the parties' 2009 registration as domestic partners in Washington; and (2) ruled that the assets the parties had acquired during this period were community property under the common

---

[9] Suppl. CP 404.

9

No. 44289-2-II

law "equity relationship" doctrine.[10]

Walsh contends that (1) RCW 26.60.080[11] limited the application of community property rights to registered domestic partnerships, beginning with either the effective date of Washington's domestic partnership statute (June 12, 2008)[12] or the date the parties registered (here, August 20, 2009), whichever is later; (2) the trial court erred in ruling that the parties had an "equity relationship" between January 1, 2005, and August 20, 2009, when they registered as domestic partners in Washington; and (3) the trial court erred in ruling that the assets the parties acquired during that 4 ½-year period were community property, subject to distribution during their dissolution trial.

---

[10] The trial court also ruled that property the parties had acquired *after* they registered as domestic partners in Washington—between August 20, 2009, and their separation on March 14, 2010—was subject to Washington's community property law and RCW 26.60.080. Neither party disputes the trial court's application of Washington's statutory community property law to this post-August 20, 2009 period of their relationship. Thus, the trial court's distribution of community property acquired during this latter period is not at issue on appeal.

[11] RCW 26.60.080, which governs community property rights of registered domestic partnerships, provides:
> Any community property rights of domestic partners established by chapter 6,
> LAWS OF 2008 shall apply from the date of the initial registration of the domestic
> partnership or June 12, 2008, whichever is later.

In 2008, Washington registered domestic partners did not automatically enjoy rights such as community property; in contrast, California registered domestic partners enjoyed the rights and duties of marriage, including community property rights, as early as 2005. 2003 Cal. Stat. 3081, [§ 4, at] 3083[-84]. Walsh contends that (1) California's broader grant of rights is a substantial difference between Washington's domestic partnership rights before 2008; (2) consequently, Washington would not have recognized the relatively expansive domestic partnerships of California in 2008, Br. of Appellant at 7-8, 16; and (3) it was not until December 2009 that Washington's domestic partnerships became "equivalent" to California's. Br. of Appellant at 16 n.1. But because we can affirm the trial court's ruling based on the alternative "equity relationship" doctrine, we need not address whether Washington would have recognized California's domestic partnerships before 2008.

[12] LAWS OF 2008, ch. 6, § 601.

In her cross-appeal, Reynolds argues that, in distributing the parties' property at the dissolution trial, the trial court abused its discretion in applying the "equity relationship" doctrine to only this 4 ½-year post-Washington registration period and in failing to consider their entire 22-year relationship as an "equity relationship."[13] Thus, we first address the propriety of the trial court's application of the "equity relationship" doctrine to the parties' pre-Washington-registration relationship. We next address whether the trial court erred in limiting application of the "equity relationship" doctrine to the 4 ½ years before the parties registration in Washington, rather than extending it to earlier periods of their relationship.

A. Application of "Equity Relationship" Doctrine Before 2008

Walsh contends that Washington's 2008 Domestic Partnership Act, chapter 26.60 RCW, did not extend community property rights to pre-existing registered California domestic partnerships under the "equity relationship" doctrine because the two states' community property rights schemes were not "substantially equivalent."[14] *See* RCW 26.60.090[15]. Walsh is incorrect.

The "equity relationship" or "'[meretricious] relationship'" doctrine is a creature of common law, not statute. *Lindsey*, 101 Wn.2d at 304 (quoting *Latham v. Hennessy*, 87 Wn.2d

---

[13] Reynolds actually uses the term "committed intimate relationship." *See, e.g.,* Br. of Resp't at 23. But for purposes of this opinion, we use the term that the trial court used, "equity relationship." CP at 375. *See also* n. 1, *supra.*

[14] More specifically, Walsh argues that (1) RCW 26.60.090, which establishes reciprocity with other states' domestic partnership laws, provides that Washington will recognize "substantially equivalent" foreign domestic partnerships; (2) when California extended community property rights to domestic partners in 2003, Washington did not; and (3) therefore, Washington and California's domestic partnership laws were not "substantially equivalent." RCW 26.60.090.

[15] The legislature amended RCW 26.60.090 in 2009, 2011, and 2012. LAWS OF 2012, ch. 3, § 12; LAWS OF 2011, ch. 9, § 1; LAWS OF 2009, ch. 521, § 72. These amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

11

550, 552-53, 554 P.2d 1057 (1976), *overruled in part on other grounds by Lindsey*, 101 Wn.2d at 303-04) (recognizing meretricious relationship doctrine and instructing trial courts to make "'just and equitable'" distribution of property when terminating such relationships).[16] Thus, the trial court did not need to conclude that California's and Washington's domestic partnership statutory schemes were "substantially equivalent" in 2008 in order to apply Washington's common law "equity relationship" doctrine to property that Walsh and Reynolds had acquired before they registered their domestic partnership in Washington in 2008.

In Washington, all property acquired during a marriage is presumptively community property. RCW 26.16.030; *In re Marriage of Short*, 125 Wn.2d 865, 870, 890 P.2d 12 (1995). In 2008, our state legislature expressly extended this community property presumption to property acquired during a registered domestic partnership, including partnerships registered in other states. RCW 26.16.030; LAWS OF 2008, ch. 6, § 604.[17] Before the legislature's statutory recognition of domestic partnerships in 2008, however, Washington courts recognized a common law "equity relationship" in a "'stable, marital-like relationship where both parties cohabit with

---

[16] *See also Olver*, 161 Wn.2d at 668-69 ("Washington common law has evolved to look beyond how property is titled, requiring equitable distribution of property that would have been community property had the partners been married.").

[17] RCW 26.60.090 expressly grants reciprocity to domestic partnerships already existing in other jurisdictions when Washington's registered domestic partnership law became effective:

> A legal union, other than a marriage, of two persons that was validly formed *in another jurisdiction*, and that is *substantially equivalent to a domestic partnership under this chapter*, shall be recognized as a valid domestic partnership in this state and shall be treated the same as a domestic partnership registered in this state regardless of whether it bears the name domestic partnership.

(Emphasis added).

knowledge that a lawful marriage between them does not exist.'" *Long*, 158 Wn. App. at 925 (quoting *Connell*, 127 Wn.2d at 346).

Courts consider several factors in determining the existence of an "equity relationship;" "[N]o one factor is determinative" or "more important than another." *Long*, 158 Wn. App. at 926. These factors include "continuous cohabitation, relationship duration, relationship purpose, pooling of resources and services for joint projects, and the parties' intent." *Long*, 158 Wn. App. at 926 (citing *Connell*, 127 Wn.2d at 346). "These factors are neither exclusive nor hypertechnical but rather a means to examine all relevant evidence." *Long*, 158 Wn. App. at 926 (citing *Pennington*, 142 Wn.2d at 602).

Here, the trial court assessed the five *Long* factors as applied to Walsh's and Reynolds' relationship and entered the following findings of fact and conclusions of law:

1. Continuous Cohabitation: The trial court found, and the record shows, "But for a few brief interruptions, the parties continuously cohabited from 1988 until 2010." Suppl. CP at 411.

2. Relationship Duration: The trial court found that the parties' relationship "lasted approximately 23 years." Suppl. CP at 411.

3. Relationship Purpose: The trial court found, "The purpose of this relationship was to create a family. This is evidenced by the parties' conception, birth, and cross adoption of three children, living together in an intimate committed relationship, supporting each other emotionally and financially and holding themselves out to the world as a family." Suppl. CP at 411.

4. Pooling of Resources: The trial court found that, although Walsh was the principal income earner, both Walsh and Reynolds "contributed their time and energy to . . . raising . . .

their family" and to "joint projects such as the extensive remodel of the Federal Way home." Suppl. CP at 411.

5. Parties' Intent: The trial court found that, although the parties "clearly intended to keep certain assets separate," there was "no doubt that they intended to live together as a family." Suppl. CP at 411.

Substantial evidence supports these findings, including that Walsh and Reynolds intended to be in a marriage-like relationship with a shared purpose. The record contains substantial evidence of their permanency planning, shared love and intimacy, adopting and raising children as a couple, extended family relationships, caring for one another when sick, providing financial and non-financial support for each other and their children, and holding themselves out as a couple. That they later formalized their relationship by registering as statutory domestic partners does not defeat application of the common law "equity relationship" doctrine to their years together before the statutory registration option became available to them. We hold that the trial court correctly ruled that Walsh and Reynolds lived in an "equity relationship" *before* they registered as domestic partners in Washington in 2009, beginning at least as far back as the January 1, 2005 date the trial court chose.

We also hold, however, that the trial court erred in limiting application of the "equity relationship" doctrine to only the 4 ½ years before the parties registered in Washington. There are several other dates that could serve as starting points for application of this doctrine here. We first consider the parties' registration in California. California's legislature first recognized domestic partnerships between same-sex couples in 1999, when it enacted CAL. FAM. CODE § 297. In 2003, California expanded this statute to give domestic partnerships the same statutory

rights and benefits as married heterosexual couples, thereby *expressly* extending community property rights to domestic partnerships. CAL. FAM. CODE § 297.5(k)(1). Walsh and Reynolds registered as domestic partners in California in 2000, receiving the benefits of California's community property rights law both at that time and later when the statute was amended in 2003.

We see no reason why the five *Long* "equity relationship" factors that the trial court applied to the parties' post-2005 relationship should not also apply to their pre-2005 domestic partnership relationship in California,[18] which, as the trial court here expressly recognized, involved *continuous cohabitation* for "approximately 23 years" in a *relationship for which the purpose* was "to create a family" while "holding themselves out to the world as a family." Suppl. CP at 411. Throughout their relationship, both Walsh and Reynolds "contributed their time and energy to . . . raising . . . their family" and to "joint projects," with "no doubt that they intended to live together as a family." Suppl. CP at 411. We hold, therefore, that the trial court should have extended application of the "equity relationship" doctrine to the parties' relationship before 2005, including their registered domestic partnership under California's act, an unimpeachable indicator of the intended nature of their relationship.

### 1. No statutory preemption before 2008

But Walsh also argues that, because the legislature "devised a statutory means of resolving property distribution issues by enacting RCW 26.09.080" and applying it to domestic

---

[18] That California's legislature did not expressly extend community property rights to registered domestic partners until 2003 has no bearing on whether the parties established an "equity relationship" before that time, with its corresponding common law community property rights.

partners in 2008,[19] this statute preempts the common law "equity relationship" doctrine. Br. of Appellant at 25. To the extent that she argues the statute retroactively preempted common law equity doctrine before 2008, when there was no legislation in Washington, Walsh is incorrect. During most of Walsh's and Reynolds' 22-year relationship, Washington's statutes neither recognized same-sex domestic partnerships nor prescribed a means of resolving their property distribution issues that expressly preempted common law. Until our legislature enacted RCW 26.09.080 and provided statutory community property rights for registered domestic partnerships, only the common law "equity relationship" doctrine addressed property distribution for such partnerships.

This common law "equity relationship" doctrine does not depend on the formality or "legality" of the parties' marriage or relationship. *Vasquez v. Hawthorne*, 145 Wn.2d 103, 107, 33 P.3d 735 (2001). For relationships that existed before our legislature enacted RCW 26.09.080, courts could apply the "equity relationship" doctrine to couples like Walsh and Reynolds, find that they had been living in a "meretricious" or "equity" relationship, and, consequently, distribute their community property equitably. *See Id.*[20] Although RCW

---

[19] RCW 26.09.080 governs the disposition of property and liabilities in a dissolution and provides relevant factors for a court to consider when distributing assets, such as:
  (1) The nature and extent of the community property;
  (2) The nature and extent of the separate property;
  (3) The duration of the marriage or domestic partnership; and
  (4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective.
The legislature amended the statute in 2008 to include the terms "domestic partner" and "domestic partnership" in addition to "spouse" and "marriage." *See* LAWS OF 2008, ch. 6, § 1011.

[20] As our Supreme Court has more specifically explained:

26.09.080 provides a framework for a trial court's distribution of a couple's domestic partnership property, the 2008 amendments to this statute do not retroactively affect the rights, benefits, and property expectations of parties to a meretricious or "equity relationship" accrued *before* the amendment's effective date in 2008. *See* LAWS OF 2008, ch. 6 § 1011. Thus, this statute does not control distribution of property that Walsh and Reynolds accumulated during their relationship before the 2008 amendment.

Walsh also cites RCW 26.60.080 as purporting to show that the legislature intended domestic partners to enjoy community property rights only as of the statute's effective date or the date the parties registered as domestic partners, whichever came later. Here, the trial court correctly ruled that the parties' pre-2008 community property rights were based on the common law "equity relationship" doctrine, rights that already existed before our legislature enacted RCW 26.60.080, formalizing community property rights "established by [chapter 26.60 RCW]" and expressly extending them to registered domestic partners effective 2008. RCW 26.60.080. Agreeing with the trial court on this point, we hold that RCW 26.60.080 did not erase the parties'

---

When equitable claims are brought, the focus remains on the equities involved between the parties. Equitable claims are not dependent on the "legality" of the relationship between the parties, nor are they limited by the gender or sexual orientation of the parties. For example, the use of the term "marital-like" in prior meretricious relationship cases is a mere analogy because defining these relationships as related to marriage would create a de facto common-law marriage, which this court has refused to do. [*Pennington*, 142 Wn.2d at 601]. Rather than relying on analogy, equitable claims must be analyzed under the specific facts presented in each case. Even when we recognize "factors" to guide the court's determination of the equitable issues presented, these considerations are not exclusive, but are intended to reach all relevant evidence.

*Vasquez*, 145 Wn.2d at 107-08.

17

"equity relationship" that already existed before they registered as domestic partners in Washington.

### 2. Findings of fact; conclusions of law

Walsh also argues that substantial evidence does not support the trial court's factual findings. Relying on *Pennington*, Walsh contends that the trial court should have reached a different conclusion after weighing the five *Long* factors.[21] Walsh asserts that, contrary to the trial court's findings, the parties did not pool their resources, arguing that instead they made a "concerted effort to remain separate financial entities," such as by maintaining separate bank accounts and by never entering into a joint debt. Br. of Appellant at 31.

But we defer to the trial court's factual findings as long as substantial evidence supports them. *Pennington*, 142 Wn.2d at 602-03. As we have already explained, here the evidence and the trial court's application of the five *Long* factors support the trial court's characterizing the parties' post-2005 relationship as an "equity relationship." Suppl. CP at 412.

### 3. Cross-appeal

In her cross-appeal, Reynolds argues that the trial court erred in declining to apply the "equity relationship" doctrine to the first 17 years of the parties' 22-year relationship. Walsh counters that (1) the trial court "properly considered the common law, [applicable] statutes, and

---

[21] More specifically, Walsh argues that, in *Pennington*, the Washington Supreme Court held that the parties did not meet the "'pooling of resources'" factor because they did not purchase property jointly, did not contribute jointly to their retirement accounts, and maintained separate bank accounts. Br. of Appellant at 28 (quoting *Pennington*, 142 Wn.2d at 607). Nevertheless, Walsh acknowledges that the purpose of her relationship with Reynolds was to "co-parent" their children. Br. of Appellant at 29. Walsh's "co-parent" assertion supports the trial court's finding that the parties held themselves out as one family, which weighs in favor of its finding an "equity relationship".

the length and nature of the parties' relationship"[22] when it limited application of the "equity relationship" doctrine to the latter period of their relationship between January 1, 2005, and August 20, 2009; but (2) in so doing, the trial court erred in using January 1, 2005, as the date on which their "equity relationship" began and their separate properties converted to community property, rather than August 20, 2009, the date when the parties registered as domestic partners in Washington.

We agree with Walsh that the trial court erred in using January 1, 2005, as the start date; but we disagree that the date should have been August 20, 2009. The findings of fact and the record do not support the trial court's legal conclusion that the parties' "equity relationship" began no earlier than 2005. *Pennington*, 142 Wn.2d at 602-03; *see Long*, 158 Wn. App. at 925 (we review de novo the trial court's legal rulings).

As the trial court explained,

> If the two people in this case were a heterosexual couple that had been cohabiting since 1988, . . . this Court would not hesitate to find that a meretricious or equity relationship existed for the 20 plus years prior to the date of the marriage.

Suppl. CP at 412. Nevertheless, the trial court declined to consider whether the facts supported applying the "equity relationship" doctrine to any period during the first 17 years of these parties' relationship, reasoning that characterizing their properties before California's domestic partnership law became effective on January 1, 2005, would "retroactive[ly]" alter their "property rights without due process of law."[23] Reynolds contends that (1) this statement shows that the trial court treated the initial period of the parties' same-sex relationship differently than it

---

[22] Reply Br. of Appellant at 5 (emphasis omitted).

[23] Suppl. CP at 412, 413. Neither party raises a due process argument on appeal.

would have treated a heterosexual relationship; and (2) acknowledging an "equity relationship" does not require "'retroactive application'" of laws governing domestic partnerships and "is no different than other cases where heterosexual couples cohabit prior to marrying."[24] Br. of Resp't at 27.

RCW 26.09.080 gives the trial court broad discretion in crafting a just and equitable distribution of the parties' property, which distribution we will not disturb on appeal absent a showing that the trial court committed a manifest abuse of discretion. *In re Marriage of Hilt*, 41 Wn. App. 434, 439, 704 P.2d 672 (1985) (citing *In re Marriage of Miracle*, 101 Wn.2d 137, 675 P.2d 1229 (1984); *Baker v. Baker*, 80 Wn.2d 736, 498 P.2d 315 (1972)). In light of the trial court's comprehensive and detailed overall distribution of Walsh and Reynolds' separate and community assets, we cannot say that the trial court abused its discretion in ruling that the parties' non-separate assets became community property beginning *at least* as early as in 2005 and in crafting its property distribution accordingly.

But the trial court failed to consider the common law and its application to the parties' "equity relationship" that existed *before* California's 2005 statutory recognition of such relationships, despite explaining that had Walsh and Reynolds been a legally recognized heterosexual marriage, it would not have "hesitate[d] to find that a meretricious or "equity

---

[24] Reynolds cites several cases for the proposition that courts treat property accumulated during a period of cohabitation before marriage as "community-like" and, thus, available for distribution during a dissolution. Br. of Resp't at 27 (citing *Bodine v. Bodine*, 34 Wn.2d 33, 36-37, 207 P.2d 1213 (1949); *Lindsey*, 101 Wn.2d at 306-07; *In re Marriage of Hilt*, 41 Wn. App. 434, 441, 704 P.2d 672 (1985)). But none of these cases stand for the proposition that a trial court is *required* to treat long-term cohabitation as an "equity relationship" that creates community property; rather, the trial court "may be . . . justified in treating such property as though it belonged to the community." *Bodine*, 34 Wn.2d at 36. *See Connell*, 127 Wn.2d at 350 (warning that an interpretation of meretricious or "equity relationships" that "equates cohabitation with marriage . . . ignores the conscious decision by many couples not to marry.").

relationship" existed for the 20 plus years prior to the date of the marriage." Suppl. CP at 412. Thus, we remand to the trial court to consider the extent of the parties' "equity relationship" during this earlier pre-2005 period, to apply the five *Long* factors to this portion of their relationship, and to revise its property distribution accordingly.

### B. Tenancy in Common, Federal Way Property

Walsh also argues that, although the trial court correctly determined that the parties owned the Federal Way property as tenants in common, the trial court improperly allocated the proceeds from the property's sale. Walsh concedes that Reynolds contributed to the property in the form of "sweat equity." Br. of Appellant at 37-38. Nevertheless, Walsh asserts that the trial court should have awarded her 100 percent of the equity in the Federal Way property, rather than 51.89 percent, because "[s]he made *all* financial contributions towards the mortgage and reconstruction of the Federal Way house . . . from her separate property funds." Br. of Appellant at 37. This argument fails.

In Reynolds' cross-appeal, she argues that (1) the trial court erred in concluding that the parties held the Federal Way home as tenants in common; and (2) instead, they owed it as joint tenants with a right of survivorship. According to Reynolds, when the parties purchased the Federal Way property, they titled it in both of their names as "joint tenants with right of survivorship, and not as community property or tenants in common." Br. of Resp't at 33-34. Reynolds is correct about the language on the title; but this language alone does not determine the legal character of the property. *See Merrick v. Peterson*, 25 Wn. App. 248, 258, 606 P.2d 700 (1980) (joint tenancy with right of survivorship requires all "four unities of time, title, interest and possession"; it is not enough to have only unity of title).

The trial court acknowledged that the Federal Way property title "express[ed] [the parties'] intent" to hold the property as joint tenants with right of survivorship. Suppl. CP at 420. Nevertheless, it concluded that, because only Walsh was liable on the mortgage, she and Reynolds held the property as "tenants in common". CP at 375. Even under the trial court's "tenants in common" characterization, Reynolds contends that (1) Walsh's mortgage obligation did not terminate the joint tenancy with right of survivorship; and (2) even if the trial court had concluded that the parties owned the property as tenants in common, the trial court acted within its discretion in dividing the parties' assets equitably, rather than awarding 100 percent of the equity to Walsh. We agree with the trial court that the parties held the Federal Way property as "tenants in common," despite their stated intent to hold title as joint tenants with right of survivorship. We also agree with Reynolds, however, that because of the parties' existing "equity relationship," the trial court did not abuse its discretion in dividing the value of the property as it did.

RCW 64.28.020 governs joint tenancy with a right of survivorship: "Every interest created in favor of two or more persons in their own right is an interest in common . . . unless declared in its creation to be a joint tenancy, as provided in RCW 64.28.010," which, RCW 64.28.010, in turn, provides that "[j]oint tenancy shall be created only by written instrument, which . . . shall expressly declare the interest created to be a joint tenancy." RCW 64.28.010. "It is well settled that a joint tenancy with survivorship is created when the four unities of time, title, interest and possession exist." *Merrick*, 25 Wn. App. at 258 (citing *Holohan v. Melville*, 41 Wn.2d 380, 249 P.2d 777 (1952)). "In a true joint tenancy, each of the tenants has an undivided interest in the whole, and not the whole of an undivided interest." *Merrick*, 25 Wn. App. at 258.

The record here shows that the parties never became joint tenants because they did not have the requisite unity under *Merrick*: Reynolds was not liable on the mortgage. Thus, any joint tenancy severed at its inception. *See Merrick*, 25 Wn. App. at 258. Despite the parties' clear specification that they took the property as joint tenants with right of survivorship, Walsh's unilaterally undertaking the mortgage obligation (1) was inconsistent with the "unity" interest element, essential to create such a joint tenancy; and (2) automatically "converted" what might have been joint tenancy with right of survivorship into a tenancy in common. *Merrick*, 25 Wn. App. at 258 ("[A]ny agreement subsequently executed which is inconsistent with the joint tenancy converts it into a tenancy in common.") We hold, therefore, that the trial court correctly concluded as a matter of law that Walsh and Reynolds owned the Federal Way property as tenants in common.

Nevertheless, in a dissolution proceeding, a trial court has discretion to divide the parties' assets in a manner that it determines is "'just and equitable.'" *In re Marriage of Farmer*, 172 Wn.2d 616, 625, 259 P.3d 256 (2011) (quoting RCW 29.06.080). Considering Reynolds' non-financial contributions to the property and regardless of Walsh's claims of her separate property contributions, the trial court here exercised this discretion by awarding Reynolds "close to a 50 [percent] share in the equity in the Federal Way home." Suppl. CP at 495. The trial court also based its decision, in part, on the fact that it did not award any maintenance to Reynolds, the party with far less income and earning potential.

We hold that the trial court did not abuse its broad discretion in the manner in which it crafted a just and equitable division of the parties' non-separate properties, including its allocation of the equity in the Federal Way property, after balancing the parties' respective needs

and contributions. We also hold, however, that the trial court erred in refusing to consider that the parties had a common law "equity relationship" before January 1, 2005, for community property distribution purposes.

### III. ATTORNEY FEES

#### A. Trial

Walsh contends that the trial court erred in awarding Reynolds her attorney fees and costs. Walsh argues that (1) the 2008 Domestic Partnership Act, chapter 26.60 RCW, does not permit a trial court to award attorney fees in a dissolution; and (2) RCW 26.09.140's fee-shifting provision, which applies generally to dissolutions, did not apply to domestic partnership dissolutions until December 3, 2009. Reynolds counters that the trial court acted within its discretion when it awarded her fees and costs. We agree with Reynolds.

#### B. Standard of Review

Attorney fees in a dissolution proceeding are based on need and ability to pay. *In re Marriage of Terry*, 79 Wn. App. 866, 871, 905 P.2d 935 (1995). We review a trial court's attorney fee award for abuse of discretion. *Kellar v. Estate of Kellar*, 172 Wn. App. 562, 591, 291 P.3d 906 (2012), *review denied*, 178 Wn.2d 1025 (2013). In determining a reasonable fee, we consider the difficulty of the case, the time involved in the preparation and presentation of the case, and the amount and character of property involved. *In re Marriage of Knight*, 75 Wn. App. 721, 730, 880 P.2d 71 (1994).

#### C. Application of RCW 26.09.140 to Domestic Partnership Dissolution

The trial court first ruled that RCW 26.09.140 applied to registered domestic partnership dissolutions. The trial court then found that "Walsh has the ability to pay, and [that] Reynolds

24

has a need. The disparity in income requires this Court to award [Reynolds] 100 percent of her attorney's fees to be paid by [Walsh]." Suppl. CP at 416. The trial court determined Reynolds' fee award according to the factors in *Knight*, and *In re Marriage of Irwin*, 64 Wn. App. 38, 822 P.2d 797 (1992); and it ordered Walsh to pay Reynolds $35,117.50 in attorney fees and $2,400.75 in costs.

Walsh asserts that, because the parties registered their domestic partnership in August 2009, before the legislature amended RCW 26.09.140 to include the current fee-shifting provision, the trial court should not have applied this amendment to their dissolution. But Walsh petitioned for dissolution in March 2011, more than a year *after* the fee-shifting amendment took effect in December 2009. Thus, the trial court properly applied RCW 26.09.140's fee-shifting provision to the parties' 2011 dissolution proceeding, the "precipitating event" for purposes of falling under this 2009 amendment. *State v. Pillatos*, 159 Wn.2d 459, 471, 150 P.2d 1130 (2007). A "'statute operates prospectively when the precipitating event for operation of the statute occurs after enactment, even when the precipitating event originated in a situation existing prior to enactment.'" *Pillatos*, 159 Wn.2d at 471 (emphasis omitted) (quoting *In re Estate of Burns*, 131 Wn.2d 104, 110-11, 928 P.2d 1094 (1997)).

Walsh also argues that substantial evidence does not support an award of attorney fees and costs to Reynolds, because, over the course of their relationship, Walsh provided Reynolds with significant assets and financial benefits, which Reynolds could have used to pay her own attorney fees. But Walsh fails to provide any authority to support her implicit argument that a trial court abuses its discretion by awarding attorney fees to a party who has received assets during the relationship and after dissolution. Nor does Walsh otherwise meet the high burden of

showing abuse of trial court discretion in its attorney fee award. *In re Custody of Smith*, 137 Wn.2d 1, 22, 969 P.2d 21 (1998) (citing *Knight*, 75 Wn. App. at 729), *aff'd*, *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Thus, we do not further address this argument. RAP 10.3(a)(6).

Walsh next argues that, even if the trial court did not abuse its discretion, we should reduce the attorney fee award to Reynolds because it was unreasonable. Walsh contends that, under the *Knight* factors, (1) the facts of the case were not difficult, (2) it was unreasonable to require her to pay fees for time Reynolds' attorney spent becoming familiar with local rules, (3) these fees were excessive given the relatively short period of the parties' registered Washington domestic partnership, and (4) the fees were unreasonable because Reynolds "had no reasonable awareness as to" how much she incurred in attorney fees. Br. of Appellant at 45. Walsh ignores that the trial court already reduced Reynolds' fees by subtracting from the requested amount the "attorney's time to familiarize herself with [Pierce County Local Rules] ($845.00)," "discovery not in compliance with [Pierce County Local Rules] ($345.00)," and "[a]ttorney fees. . . [for a] trial brief never submitted ($1,445.00)." Suppl. CP at 474.

Walsh does not show that the trial court's discretionary determination of attorney fees was unreasonable. Therefore, we affirm the trial court's attorney fee and costs award at trial.

### D. Appeal

Reynolds also asks us to award her attorney fees and costs on appeal based on her need and Walsh's ability to pay, citing RCW 26.09.140. This statute provides that, in an appeal of a trial court's order in a dissolution proceeding, "the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in

No. 44289-2-II

addition to statutory costs." Thus, we have discretion to award attorney fees after considering the relative resources of the parties and the merits of the appeal. *In re Marriage of Leslie*, 90 Wn. App. 796, 807, 954 P.2d 330 (1998), *review denied*, 137 Wn.2d 1003 (1999); RAP 18.1. Because Reynolds prevails on appeal, we grant her attorney fees and costs on appeal, subject to her demonstrating to our court commissioner her need relative to Walsh's ability to pay and her submitting supporting documentation.

We reverse the trial court's property distribution and remand to the trial court (1) to reconsider whether the parties had a common law "equity relationship" before January 1, 2005; and (2) if so, to redistribute the parties' community assets accordingly. We affirm the trial court's award of attorney fees and costs to Reynolds.

_____
Hunt, J.

We concur:

_____
Bjorgen, A.C.J.

_____
Lee, J.