[No. 28533.  Department Two.  December 11, 1941.]

GORDON T. TYREE, *Appellant*, v. EARL B. GOSA, *et al.*,
*Respondents.*[1]

*Marion Garland, Sr.*, and *Marion Garland, Jr.*, for
appellant.

*Falknor, Emory & Howe* (*John M. Davis*, of counsel),
for respondents.

ROBINSON, C. J.—Before entering upon the discussion
of the legal problems presented by this appeal, we
think we should set out, by way of preface, certain
facts not hitherto of record.

[1]Reported in 119 P. (2d) 926.

On September 20, 1941, two days after the hearing of this cause, the appellant addressed a three page letter to each of the five judges who heard the appeal. In these letters, which were identical in content, he claimed to have been unfairly treated by the trial judge; criticized the conduct of the case by his attorneys; stated, as facts, matters not appearing of record; attempted to demonstrate, by argument, that he had been damaged in the sum of $947.60; and referred at length to various personal matters and relationships, with the obvious design of enlisting the personal sympathy of the members of the court. Since the appellant's attempt to thus surreptitiously secure an unfair advantage in this court clearly affects his credibility and impairs the weight of the testimony he gave on his own behalf in the court below, it is, perhaps, scarcely necessary to say that whatever relief he may receive on this appeal will be afforded, not because of his letters, but in spite of them.

It is ordered that one of the letters, above mentioned, be filed and made a part of our record in this cause.

In September, 1936, the appellant Tyree purchased, at a Kitsap county tax sale, forty acres of land described as the northeast quarter of the northwest quarter of section 10, township 23 north, range 1 W. W. M., and established his home thereon in 1937. Since that time he has sold, on conditional contracts, several five acre strips running across the quarter in an easterly and westerly direction. At all times since the Tyree purchase, Pope & Talbot, Inc., has owned the fee title of the land adjoining his property on the west, although at some time, prior at least to the spring of 1940, it sold a five acre tract abutting upon the Tyree tract to B. M. Meindl, and another small tract directly north of it, and also abutting on the Tyree property, to Earl B. Gosa. These, however, were conditional sales, Pope & Talbot retaining title.

In October, 1940, Tyree brought this action against the Meindls, the Gosas, and Pope & Talbot, Inc., setting up that the west boundary of his land was confused and uncertain, and that its true location depended upon the correct location of the northwest corner of section ten. It was further alleged that certain buildings erected by the Gosas and the Meindls were, in fact, encroachments upon plaintiff's land. The plaintiff prayed for the establishment of the true boundary, and that the Gosas and Meindls be required to remove the alleged encroachments.

The defendants, answering jointly by a pleading verified by Pope & Talbot, Inc., denied that the section corner claimed by plaintiff was the true section corner and that the Gosa and Meindl buildings were on plaintiff's land. They pleaded, as a first affirmative defense, that the plaintiff acquiesced in the construction of the buildings at their actual locations, and, while alleging that the buildings were actually on land belonging to Pope & Talbot, Inc., pleaded that, if that were not so, the buildings were constructed in good faith and in reliance upon the plaintiff's acquiescence and agreement. They further pleaded, as a second affirmative defense, that the buildings could not be removed without a monetary loss out of all proportion to the value of the land in dispute, and prayed the court, if the buildings were found to be, in fact, on plaintiff's land, to fix adequate compensation for the value of the land encroached upon, instead of ordering them removed. Plaintiff, in reply, denied the factual allegations of the affirmative defenses.

Prior to trial of the action, the defendants petitioned the court to appoint a commission, in accordance with Rem. Rev. Stat., §§ 947, 948 [P. C. §§ 7412, 7413], to inquire into the matter of the disputed boundary, survey, erect, establish, and mark the true boundary, and

return the plat of the survey and the field notes thereof into court, together with their report. The petition was granted.

The commissioners' report showed that the Gosa house was partly on Tyree land, and the Meindl house entirely so. Such reports are, by statute, merely advisory. At the trial, Pope & Talbot, Inc., attacked the report, showing, by the testimony of their own and other engineers, the extreme care with which the location of the northwest corner of section ten had been fixed on their survey, and suggesting that the marks on the witness trees surrounding the corner adopted by the commission, which we will hereinafter call the Tyree corner, were spurious. The commissioners were present and defended their findings. As respondents have not cross-appealed, we need not discuss this conflicting evidence. It will be sufficient to say that the trial court was convinced, and we are alike convinced, of these two things: (1) that the Pope & Talbot survey was carefully made and in good faith, but (2) that the commissioners found the correct section corner.

After the correct west boundary of the Tyree property was established by working back from the northwest corner of section ten, as claimed by Tyree, established by the commissioners, and confirmed by the court, it was found that the actual amount of land in dispute, upon which Pope & Talbot's contract purchasers Meindl and Gosa had encroached, was an irregular strip, in round numbers about 791 feet in length north and south, 75 feet in width at the north end, and 59 at the south, containing 1.162 acres. The matter was further complicated by the existence of a road and bridge which afforded access to the various holdings of the contending parties. The trial court, after having taken certain evidence as to values, access, etc., entered a decree requiring Pope & Talbot, Inc., to

forthwith deposit two hundred fifty dollars in court for the account of Tyree, such sum to be paid over to him upon his depositing a deed quitclaiming the strip of land to Pope & Talbot; this to be done within ten days. A commissioner was appointed to convey in case of Tyree's failure to do so. Easements were granted to all parties over and to the bridge above referred to. It is from this part of the decree requiring him to sell and surrender his property at a valuation fixed by the court that appellant appeals.

If there be any way in which that portion of the decree can be upheld, it must be either upon the theory of estoppel or by the application of the so-called doctrine of "balancing the equities."

It appears that, in its 1938 survey, Pope & Talbot, Inc., made a mistake of twenty feet in the location of a corner, correcting it after protest. This incident, Tyree testified, raised a doubt in his mind as to the accuracy of its surveys. In November, 1939, Tyree's father asked W. V. Miller, a retired surveyor, who some years before had surveyed that district for the United States navy, if he knew the location of the northwest corner of section ten. He said that he had found it before and believed he could do so again. During the latter part of that month, he pointed out to Tyree what he claimed to be the true corner. It was somewhat to the westward of that set by Pope & Talbot. At that time, however, Miller did not work back from the corner and. locate the western boundary of the Tyree tract. Sometime after this, exactly how long we do not know, but before the following March 19th, Tyree informed Pope & Talbot's engineer, Mr. Alexander, that the true corner had been found. Alexander himself testified, in part, as follows:

"Q. When was it that you first went to the scene of this Tyree corner? A. 19th of this March I believe, 19th of March, 1940. . . . Q. What was the occa-

sion of your going to the scene of this Tyree corner? A. Mr. Tyree had informed us that he had found a corner down there. Q. Did he ask you to see it, or did you ask to take a look? A. I probably told him I would go down and take a look some day."

That "some day" proved to be March 19th. On that day, Mr. Alexander said he spent an hour and a half in carefully examining the evidence Tyree pointed out to him.

"Q. Did you return to that corner at any time later with Mr. Tyree? A. By appointment we met there, and Tyree and Mr. Miller, June 19th, 1940, and we all went up."

"We" in Mr. Alexander's last answer includes Mr. Cressey, a cruiser and field man of long experience, who had assisted him in fixing the Pope & Talbot corner in 1938. The year before that, while executing another commission, Cressey had spent six hours in investigating the so-called Tyree corner. He rejected it then, again in 1938, and continued to do so when he accompanied Mr. Alexander to the conference with Tyree and Miller on June 19, 1940. In fact, both Alexander and Cressey, as representatives and employees of Pope & Talbot, rejected the Tyree corner right down to, and throughout, the trial, which took place in February, 1941.

It is argued, however, that Tyree should be estopped because he did not prevent Meindl and Gosa from building on his land. His reply to that was that he told them that he thought they were building on his land, and that they replied that they were relying on the stakes set by their vendor. There was no rebuttal of this evidence. There is no evidence as to just when Meindl and Gosa built their houses. The only evidence as to that is that it was some time in the spring of 1940. This date, pivotal with relation to

the defense of estoppel, could not be definitely fixed, because, for some strange reason, Pope & Talbot's co-defendants Meindl and Gosa were not in attendance at the trial. Did they build or commence building before or after Tyree notified their vendor, at some time prior to March 19, 1940, that he had found the true corner? We do not know; but it seems sufficient to point out that in any event Tyree was at no time in a position to take a positive or belligerent attitude in the matter. Even after his engineer's survey, made in June, 1940, showed that Meindl and Gosa were encroaching on his land, their vendor denied that that survey was correct, and, as we have seen, supported that denial by the opinion of its qualified and duly licensed engineers. Tyree's supporting authority was limited, and, technically at least, subject to attack. When the survey made by his lone engineer was offered in evidence at the trial, the following occurred:

"MR. HOWE: I object to it Your Honor. This man has testified that he is not a licensed surveyor, and it is a misdemeanor to practice without a license. It is a crime to do so. He admits he is not. I think he is not qualified to testify, whose testimony violates the statute. Here is the statute, Your Honor. It says: (Reading Section 813 to the Court). MR. PURVES: He has testified he is a registered engineer. THE COURT: Even so, I don't think that will affect his ability to make a survey and tell what his opinion is. He might be guilty of a crime but that would not disqualify him. It might affect his credibility. It may be admitted."

We are inclined to the opinion that, under the circumstances shown by the record to have existed during the spring and summer of 1940, appellant protested about as much and in the same manner as the standard prudent and reasonable man placed in his position might reasonably be expected to protest.

It requires very clear and cogent evidence to estop an owner out of a legal title to real property. We do

not find such evidence in the record, or, indeed, evidence of any statements by appellant or of any acts on his part inconsistent with the claim made in his complaint. Pope & Talbot, Inc., were not induced to change position by any acts or representations of the appellant. In fact, it would have proved greatly to its advantage had it done so. No representations of appellant induced the Meindls and Gosas to locate their buildings where they did, at least there is no evidence to that effect. On the contrary, there is some evidence, slight, but unrebutted, that they fixed the locations of their buildings upon the representation of their vendor, Pope & Talbot.

■ We come now to the doctrine of balancing the equities.

There was evidence that the strip of land in controversy was not worth more than two hundred or two hundred fifty dollars. There was slightly more than an acre in the strip. Tyree had sold adjacent parcels out of his forty acres at one hundred dollars per acre. It is claimed, in the letters referred to at the beginning of this opinion, that the strip had peculiar value on account of its suitability for building sites. But the evidence, as found in the record—and, of course, we consider the record only,—indicates that the two hundred and fifty dollar valuation was liberal and even generous. There is, on the other hand, evidence that it would cost four or five hundred dollars to move the Gosa house. There is evidence also that the Meindl house is of such construction that it could not be moved. As it stands, it is worth five or six hundred dollars. In addition, each of the parties, if required to move, would lose his well. Their cost does not appear in the record, but, as they were fairly deep and partly lined with concrete, it would be substantial. Let us say, erring slightly, perhaps, if at all, in favor of the respondents,

·that the proportion is fifteen hundred dollars to two hundred fifty dollars, or six to one; that is, the loss, if the Gosas and Meindls be compelled to remove their buildings, would be six times the loss to Tyree, if he were compelled to surrender the strip of ground upon which the buildings stand.

The respondents, in their brief, in urging the application of the doctrine of balancing the equities, cite 32 C. J. 147, Injunctions, § 195; 32 C. J. 22, Injunctions, § 5; 28 Am. Jur. 250, Injunctions, § 54; 28 Am. Jur. 253, Injunctions, § 56; and two cases, *Mary Jane Stevens Co. v. First Nat. Bldg. Co.*, 89 Utah, 456, 57 P. (2d) 1099; *Hunter v. Carroll*, 64 N. H. 572, 15 Atl. 17. It will be seen, in examining the footnotes to the texts cited, that many of the cases deal with instances where a cornice projects a few inches on another's land, or the wall of a great building encroaches a few inches. No Washington case is cited in support of the doctrine. If it existed in our local jurisprudence at the time *Wells v. Parks*, 148 Wash. 328, 268 Pac. 889, was decided, it would seem that it would have at least been invoked.

It is very difficult to see how one can get an equity in the land of another by merely building upon it, however innocently. It is clear, however,—and this is all that is necessary to now decide—that the doctrine invoked cannot be applied in the instant case; for, manifestly, the effect of the court's decision is to condemn the appellant's strip of land for the private use of Pope & Talbot, Inc., contrary to the provisions of our state constitution relating to condemnation. Article 1, § 16, as amended by amendment IX, provides, in part, as follows:

"Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. . . ."

By the decree ordering Tyree to deed the strip of land to Pope & Talbot, Inc., his land is taken for the private use of Pope & Talbot, Inc., and that private use is not one within the exception clause. Hence, that portion of the decree is invalid. No court has the power to compel the appellant to convey and surrender his property for any other person's private use (except for ways of necessity, etc.) in exchange for two hundred and fifty dollars, or any other sum, no matter how great.

In pronouncing the opinion of the court in *White Bros. & Crum Co. v. Watson,* 64 Wash. 666, 671, 117 Pac. 497, 44 L. R. A. (N. S.) 254, although the case is not at all factually in point, the late Judge Ellis had occasion to very clearly and persuasively set out the dangers of the line of reasoning which underlies the doctrine invoked by the respondents:

"If it is something in which he has the actual right of property there is no rule of law nor principle of equity which would warrant a court in taking it from him against his will or for the benefit of another. No amount of hardship in a given case would justify the establishment of such a precedent. The next step in the invasion of the right of property would be to invite the courts to measure the comparative needs of private parties, and compel a transfer to the one most needing and who might best utilize the property. If a man may be required to surrender what is his own, because he does not need it and cannot use it, and because another does need it and can use it, then there is no reason why he may not be required to surrender what he needs but little because another needs it much. A doctrine so insidiously dangerous should never find lodgment in the body of the law through judicial declaration."

It may be added that it cannot find such lodgment so long as the constitutional provision, above quoted, remains in force and is given effect.

The instant case furnishes a good illustration of a

fact which, unfortunately, few laymen appreciate and understand, and that is, that, for one reason or another, it is frequently impossible for a court to render a decision that satisfies the inherent sense of justice. Here, the well-intentioned and common sense effort of the trial judge to dispose of the controversy on fair and just terms—and we think that, in the broad sense, they were fair and just—must come to naught. The right of the appellant, however, to refuse to accept and abide by the trial court's decree is clear and undeniable.

That portion of the decree requiring the appellant to deed a portion of his land to Pope & Talbot, Inc., in exchange for the sum of two hundred and fifty dollars, and establishing mutual easements, must be, and is reversed. If, within thirty days after the remittitur in this case has gone down, the parties have not been able to settle their difficulties by negotiation, the trial court is directed, upon the application of appellant, to enter an order requiring the Meindls and Gosas to remove their encroachments from his land, fixing in such order such time for its complete execution as may, under the then circumstances, appear reasonable and necessary.

BLAKE, BEALS, SIMPSON, and JEFFERS, JJ., concur.