**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Domestic Partnership of: | No. 51125-8-II |
| JEAN M. WALSH, | |
| Respondent/Cross Appellant, | UNPUBLISHED OPINION |
| And | |
| KATHRYN L. REYNOLDS, | |
| Appellant/Cross Respondent. | |

GLASGOW, J. — Kathryn Reynolds appeals, and Jean Walsh cross-appeals, from a court ordered division of community-like property that occurred as a result of their domestic partnership dissolution. Reynolds argues that the trial court ignored our prior decision in *Walsh v. Reynolds*, 183 Wn. App. 830, 335 P.3d 984 (2014) (*Walsh* I) and misapplied the committed intimate relationship doctrine to the parties' relationship. Walsh argues that our prior decision was incorrect because its application would violate her constitutional rights and was also improper under Washington common law.

We hold that the trial court erred when it failed to follow the law of the case and when it declined to find a committed intimate relationship existed prior to 2005. The trial court also erred in conflating the issue of whether and when a committed intimate relationship existed with the issue of the proper characterization of the parties' property as separate or community-like, and there is no constitutional barrier to finding a committed intimate relationship prior to 2005.

We reverse and remand for a different trial judge to enter findings consistent with the law of the case and the committed intimate relationship doctrine as articulated in this opinion. The

trial court must determine when, prior to 2005, the committed intimate relationship began in accordance with our prior decision. The trial court must apply the presumption that all property acquired during the committed intimate relationship is community-like. The court must then characterize the parties' property as either community-like or separate by applying that presumption and by considering whether the parties had an agreement to maintain separate property. The trial court must do so with the understanding that there is no constitutional barrier to applying the presumption to community-like property acquired during the committed intimate relationship. The trial court must then distribute the property accordingly.

FACTS

I. WALSH AND REYNOLDS'S RELATIONSHIP

In 1988, while working as an orthopedic surgeon in Fresno, California, Jean Walsh met Kathryn Reynolds. After they dated for about three months, Reynolds moved into Walsh's home. Reynolds did not pay any part of the mortgage or utilities, but she and Walsh agreed that Walsh would pay Reynolds to perform housekeeping. During the time that they lived together, Walsh also made contributions to Reynolds's separate retirement account. And although the two lived together, they maintained separate bank accounts and finances during the course of their 20 year relationship.

In 1989, Reynolds was laid off from work and returned to school at Fresno State University. Walsh paid Reynolds's tuition and other school expenses. In 1990, Walsh and Reynolds decided to have a child and, in 1992, Walsh gave birth to Julia.

After Julia was born, Walsh paid Reynolds additional money for providing daycare. In approximately January 1993, Reynolds moved out of Walsh's house but Walsh continued to pay

Reynolds for household and daycare services. A few months later, Reynolds moved back into Walsh's house and in December 1993, Reynolds adopted Julia.

In 1996, Walsh gave birth to another child, Joe, whom Reynolds adopted in 1997. At some point prior to Joe's conception, the parties had stopped being physically intimate. In 1998, Reynolds gave birth to a third child, Emily, and Walsh adopted Emily in 2000. Walsh paid for all three adoptions.

When Walsh was pregnant with Joe in 1996, she sold her private medical practice and one share of a local health management company, and she used the proceeds and money from her personal savings to purchase property in Fresno. Walsh's income decreased significantly after she sold her practice, but she continued to pay Reynolds at the same rate as she had before. In addition to paying Reynolds, Walsh paid all expenses for the children, mortgage, utilities, as well as other household expenses.

When Reynolds paid for something for the children or the household, she would generally request and receive reimbursement from Walsh. For convenience, Walsh added Reynolds as an authorized user on two of her credit cards. However, throughout their relationship, Walsh and Reynolds otherwise maintained separate financial accounts and records. During their relationship, Walsh paid off a $7,500 credit card debt that Reynolds owed, which Reynolds repaid to Walsh through a $500 monthly deduction in Walsh's regular payments to Reynolds. Between 1990 and 2011, Walsh paid Reynolds over $500,000, which Reynolds reported as income.

On March 6, 2000, Walsh and Reynolds registered as domestic partners in California, which, like Washington, is a community property state. CAL. FAM. CODE § 760. At the time,

3

though, California did not extend community property rights to domestic partners; the domestic partner statute instead addressed rights related to issues like healthcare. *See* Former CAL. FAM. CODE § 297 (1999); CAL. HEALTH & SAFETY CODE § 1261(a), § 1374.58.

In April, Walsh sold her house in Fresno, California and purchased a house in Tacoma, Washington, where she found employment as an orthopedic surgeon. After moving to Tacoma with Reynolds and the children, Walsh continued to pay for the mortgage, health and dental insurance, auto insurance, the children's private school tuition, and other household expenses. Walsh provided Reynolds with medical benefits by listing her as a domestic partner with Walsh's insurer. Walsh also continued to pay Reynolds for childcare and housekeeping. Walsh and Reynolds each titled one car in their own name and titled another car in both of their names.

In 2003, Walsh sold the house in Tacoma and used the proceeds to purchase a home in Federal Way, Washington. Walsh and Reynolds both signed the deed but Walsh took out a mortgage solely in her name. Reynolds did not make any financial contribution to the purchase or make any payment on the mortgage. Walsh paid for all utilities.

Also in 2003, California amended its domestic partner law to extend all rights available to married couples, including community property rights, to California's registered domestic partners, effective January 1, 2005. CAL. FAM. CODE § 297.5(a). The new law required notice to all California registered domestic partners about the change in the law. CAL. FAM. CODE § 299.3(a). Both Walsh and Reynolds denied ever receiving notice. Neither sought to change their domestic partner status in California.

4

In August 2009, Walsh and Reynolds registered as domestic partners in Washington. The parties separated seven months later on March 14, 2010. Walsh petitioned for dissolution on March 11, 2011.

## II. FIRST TRIAL

The parties agreed on a parenting plan and child support for their children, then ages 19, 16, and 13. The issues remaining for trial were property distribution and attorney fees. The parties had amassed over $2 million in real property, retirement savings, and investment accounts. After a three-day trial, the trial court concluded that the parties lived in a committed intimate relationship[1] from January 1, 2005 to August 20, 2009 when they registered as domestic partners under Washington's Domestic Partnership Act, chapter 26.60 RCW.

The court found that Walsh and Reynolds cohabited from 1988 to 2010 and the purpose of their relationship was to create a family. While Walsh was the principal earner, they both contributed time and energy to raising their family, they jointly remodeled their Federal Way home, and they intended to live together as a family. The court chose January 1, 2005 because it was the effective date of California's amendment to its domestic partnership statute expanding legal protections related to property available to married couples to domestic partnerships. *Walsh* I, 183 Wn. App. at 852-53; CAL. FAM. CODE § 297.5(a). The trial court reasoned that picking any earlier date would retroactively alter the parties' property rights without due process of law. *Walsh* I, 183 Wn. App. at 852-53. The court also found that the couple intended to maintain separate assets and liabilities except for the Federal Way property and a van. The court

---

[1] The trial court used the term "equity relationship," which we also used in the initial appeal in this case. *See Walsh* I, 183 Wn. App. at 852-53. We use "committed intimate relationship" here because it has emerged as the more commonly used term.

noted in its oral ruling that if the parties had been a heterosexual couple and married in 2009, rather than registered as domestic partners, it "would not [have] hesitate[d] to find that a [committed intimate relationship] existed for the 20 plus years prior to the date of the marriage." Clerk's Papers (CP) at 412.

The trial court ordered the parties to sell the Federal Way house, allowed an offset of approximately $40,000 to Walsh for her contribution of an inheritance from her father, and divided the remaining proceeds 51.89 percent to Walsh and 48.11 percent to Reynolds. The trial court awarded no maintenance to Reynolds.

The trial court equally divided the remaining community-like property acquired between January 1, 2005 and March 14, 2010. The trial court also awarded Reynolds $35,117.50 in attorney fees and $2,400.75 in costs. Walsh appealed and Reynolds cross-appealed.

### III. FIRST APPEAL

On appeal, we held in relevant part that the trial court correctly ruled Walsh and Reynolds had lived in a committed intimate relationship prior to registering as domestic partners in Washington in 2009, beginning at least as far back as the court's chosen date of January 1, 2005. But we expressly determined that the trial court "should have extended the application of the [committed intimate relationship] doctrine to the parties' relationship before 2005, including their registered domestic partnership under California's act [in 2000], an unimpeachable indicator of the intended nature of their relationship." *Walsh* I, 183 Wn. App. at 848. We also noted in a footnote that no party had argued that treating any portion of Reynolds and Walsh's property as community-like would violate due process. *Id*. at 852 n.23.

6

We accordingly remanded to the trial court "to consider the extent of the parties' [committed intimate relationship] during this earlier pre-2005 period, to apply the [common law] factors to this portion of their relationship, and to revise its property distribution accordingly." *Id.* at 853. Later in the opinion, we reiterated our disposition as a remand to the trial court "(1) to reconsider whether the parties had a common law [committed intimate relationship] before January 1, 2005, and (2) if so, to redistribute the parties' community assets accordingly." *Id.* at 859.

IV. REMAND

After hearing two additional days of testimony, the trial court on remand found that the parties did not form a committed intimate relationship prior to 2005 and declined to revise its previous distribution of their assets, despite this court's opinion.

The trial court concluded that our opinion did not require it to find that a committed intimate relationship existed before January 1, 2005. Instead, the court ruled that our decision only required it to reconsider the date of commencement of such a relationship. Because the trial court had previously concluded that the constitution did not allow it to apply equitable principles prior to January 1, 2005, and we did not specifically address that reasoning in the initial appeal, the trial court decided that its constitutional concerns were still valid. The trial court further explained that applying equitable principles prior to the date that California law applied community property law to domestic partnerships, would undermine the parties' expectations to such a degree that it would violate the takings clause, due process, and equal protection. The trial court declined to follow our conclusion that the parties' registration as domestic partners in 2000 was an "unimpeachable indicator of the intended nature of their relationship." CP at 769.

7

The trial court adopted its prior findings and conclusions by reference but also added findings that the parties' relationship was not "marital like," based on the fact that Walsh paid Reynolds for housekeeping and childcare and the parties stopped being physically intimate after their second child was born. CP at 771. The trial court said: "[T]his Court concludes that the parties' intent was not to create a committed intimate relationship whereby each party would have an interest in the property acquired during the relationship." CP at 771. Then, merging its discussion of whether a committed intimate relationship existed with its discussion of whether the parties had established an intent to maintain separate property, the court again concluded that "these parties intentionally chose not to engage in a 'marital like' relationship with regard to property and debt acquisition." CP at 771.

Finally, the trial court found that even if the parties were in a committed intimate relationship that began in 1988, "there is clear, cogent and convincing evidence that [they] agreed to the characterization of all property acquired during their relationship" as separate property, through something akin to an oral prenuptial agreement. CP at 772. The court relied on the fact that Walsh paid Reynolds and Reynolds treated those payments as income for tax purposes. Walsh lent Reynolds money, which Reynolds repaid. The parties titled bank accounts and vehicles in their own names unless they intended a vehicle to belong to the family. The trial court then found "that they did not intend to create community property." CP at 772-73. Thus, the trial court found no basis to redistribute the parties' assets and debts.

The court ordered Walsh and Reynolds each to pay their own attorney fees and costs related to remand. The court concluded that the statute authorizing attorney fees in the dissolution of a marriage or domestic partnership does not apply to distribution of property in a

8

committed intimate relationship, and even if it did, Reynolds had income and assets available to pay her own attorney fees and costs.

After the court issued its letter ruling, but before it issued a final order, Reynolds moved for discretionary review. Our commissioner denied review at that time. The trial court then entered its final order. Reynolds appeals from that order and Walsh cross-appeals.

ANALYSIS

I. COMMITTED INTIMATE RELATIONSHIPS
AND STANDARD OF REVIEW

The common law of committed intimate relationships can apply when the couple's relationship preceded a marriage or when the parties were never married. *See Connell v. Franciso*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995); *In re Marriage of Lindsey*, 101 Wn.2d 299, 304, 678 P.2d 328 (1984). In 2001, the courts began applying this doctrine to same sex couples. *Vasquez v. Hawthorne*, 145 Wn.2d 103, 107, 33 P.3d 735 (2001). Notably, Washington courts were willing to apply the doctrine to same sex couples even before the legislature made either marriage or "everything-but-marriage" domestic partnerships legally available to same sex couples in Washington. *See id.*; RCW 26.04.010 (Referendum Measure No. 74 approved November 6, 2012); chapter 26.60 RCW (Senate Bill 5336 signed into law April 21, 2007).

When called upon to consider the committed intimate relationship doctrine, a court must first apply a multifactor test to determine whether such a relationship existed and if so, when it came into being. *Connell*, 127 Wn.2d at 349. Once a trial court determines the existence of a committed intimate relationship, the court then evaluates the interest each party has in the property acquired during the relationship and makes a just and equitable distribution of the property. *Id.* The doctrine therefore consists of two separate inquiries: first, whether a

committed intimate relationship existed and when it began; and second, if such a relationship existed, how to characterize and distribute the parties' property acquired during the relationship.

Courts consider five factors to determine whether the parties had a committed intimate relationship: continuous cohabitation, relationship duration, relationship purpose, pooling of resources, and the parties' intent. *In re Meretricious Relationship of Long*, 158 Wn. App. 919, 926, 244 P.3d 26 (2010). No single factor is determinative or more important than another. *Walsh* I, 183 Wn. App. at 845. "'These factors are neither exclusive nor hypertechnical but rather a means to examine all relevant evidence.'" *Id.* (quoting *Long*, 158 Wn. App. at 926). A necessary part of finding such a relationship existed is determining when it began.

Upon finding a committed intimate relationship, the trial court must then characterize all property acquired through the parties' efforts during the relationship. *Id*. at 841. The court may characterize property as either "separate" or "community" by analogy to marital property. *Id.* However, unlike in a marriage dissolution where all property is subject to distribution, in a committed intimate relationship only property characterized as community-like property is subject to distribution. *Id.* at 842. Even so, if the court is satisfied that an increase in value of separate property is attributable to community labor or funds, the contributing party "'may be equitably entitled to reimbursement for the contributions that caused the increase in value.'" *Id.* (quoting *Long*, 158 Wn. App. at 929).

There is a rebuttable presumption that all property acquired during a committed intimate relationship belongs to both parties and is subject to equitable distribution. *Connell*, 127 Wn.2d at 351; *In re Marriage of Pennington*, 142 Wn.2d 592, 602, 14 P.3d 752 (2000). This presumption applies even if the property is held or titled in only one party's name. *Connell*, 127

10

Wn.2d at 351; *Olver v. Fowler*, 161 Wn.2d 655, 668-69, 168 P.3d 348 (2007). A party can challenge the presumption with evidence that the property was acquired with funds that would have been characterized as separate property had the parties been married. *Connell*, 127 Wn.2d at 352.

The character of property is determined under the law of the state in which the couple was domiciled at the time of its acquisition. *In re Marriage of Smith*, 158 Wn. App. 248, 259, 241 P.3d 449 (2010). "'Separate property retains its separate character when it is brought into Washington, unless it is commingled with community property.'" *Id.* (quoting *In re Marriage of Landry*, 103 Wn.2d 807, 810, 699 P.2d 214 (1985)).

Division One of this court has concluded that an oral agreement between the parties in a committed intimate relationship "to keep their incomes and other property separate during their relationship may rebut this presumption, provided the agreement is performed." *In re Parentage of G.W.-F.*, 170 Wn. App. 631, 634, 285 P.3d 208 (2012). The trial court must also evaluate such an agreement for procedural and substantive fairness. *Id.* at 634, 645.

We review de novo the trial court's legal conclusion that a committed intimate relationship existed and when it began. *Muridan v. Redl*, 3 Wn. App. 2d 44, 56, 413 P.3d 1072, *review denied*, 191 Wn.2d 1002 (2018). Because this is a mixed question of fact and law, we review the trial court's challenged factual findings for substantial evidence, and we review de novo whether its findings of fact support its conclusions of law. *Id.* With regard to challenged findings, evidence is substantial if it would persuade a fair minded, rational person. *Id.* at 57. Then we review for abuse of discretion whether the court's property distribution was just and equitable. *Id.*

11

## II. WALSH'S INITIAL PROCEDURAL ARGUMENTS

As an initial matter, Walsh argues that when this court denied Reynolds's motion for discretionary interlocutory review, our commissioner made a final ruling that the trial court followed our remand instructions. But denial of discretionary review "does not affect the right of a party to obtain later review of the trial court decision or the issues pertaining to that decision." RAP 2.3(c). The commissioner did not rule on the merits. Indeed the commissioner correctly acknowledged that Reynolds could still appeal as a matter of right upon the trial court's entry of its final order.

Walsh also argues that because Reynolds assigned error to all of the trial court's findings of fact, she fails to adequately challenge the trial court's individual findings in this appeal. However, RAP 1.2(a) permits appellate review when the nature of the challenge is clear and the challenged findings are, in fact, set forth in the appellant's brief. *Smith v. Emp't Sec. Dep't*, 155 Wn. App. 24, 33, 226 P.3d 263 (2010). The nature of Reynolds's challenge to the trial court's findings of fact is clear from her brief, so we consider the merits of her arguments.

## III. TRIAL COURT'S RULING ON REMAND

Reynolds claims that the trial court's ruling on remand violated our mandate in *Walsh* I, 183 Wn. App. 830. We agree that the trial court failed on remand to follow our prior decision and the trial court's ruling on remand relied on incorrect legal conclusions about the application of constitutional provisions.

A.      Law of the Case

A decision of the appellate court establishes the law of the case and it must be followed by the trial court on remand. *Lodis v. Corbis Holdings, Inc.*, 192 Wn. App. 30, 58, 366 P.3d

12

1246 (2015). "[T]he parties and the trial court [are] all bound by the law as made by the decision on the first appeal." *Id*. at 57.

This rule "'forbids, among other things, a lower court from relitigating issues that were decided by a higher court, whether explicitly *or by reasonable implication*, at an earlier stage of the same case.'" *Lodis*, 192 Wn. App. at 56 (emphasis added) (quoting *Mun. of San Juan v. Rullan*, 318 F.3d 26, 29 (1st Cir. 2003)). The court "may exercise discretion where an appellate court directs it to 'consider' an issue," provided it adheres to the appellate court's instructions. *In re Marriage of McCausland*, 129 Wn. App. 390, 399, 118 P.3d 944 (2005), *rev'd on other grounds*, 159 Wn.2d 607 (2007) (quoting *State ex. rel. Smith v. Superior Court*, 71 Wash. 354, 357, 128 P. 648 (1912)). But a trial court must adhere to the appellate court's instructions and cannot ignore specific holdings and directions on remand. *Bank of Am., N.A. v. Owens*, 177 Wn. App. 181, 189, 311 P.3d 594 (2013).

B.      *Walsh* I Was Not Clearly Erroneous

Before discussing whether the trial court violated the law of the case by ignoring our holdings in *Walsh* I, we must first address Walsh's arguments in her cross-appeal that *Walsh* I was wrongly decided.[2] We disagree and decline to revisit *Walsh* I.

Under RAP 2.5(c)(2), we may review the propriety of an earlier decision in the same case "when the decision is erroneous and when justice would best be served by review." *Sintra, Inc.*

---

[2] We note that Reynolds asks us to dismiss Walsh's cross-appeal because Walsh is not an "aggrieved party" under RAP 3.1 and she invited the trial court to decide the case in the very way that she now claims was error. Reynolds also claims that Walsh forfeited her constitutional claims (discussed below) by failing to bring them in the initial appeal. However, as Walsh's arguments are also alternative bases for affirming the trial court, we exercise our discretion to address them under RAP 2.5(c)(1).

*v. City of Seattle*, 131 Wn.2d 640, 652, 935 P.2d 555 (1997). Division One recently reiterated the test for deviating from a previous decision in the same case: "whether the prior decision was clearly erroneous and, if so, whether the erroneous decision works a manifest injustice to one party." *Morpho Detection, Inc. v. Dep't of Revenue*, --- Wn. App. ---, 440 P.3d 1009, 1015 (2019). Walsh makes a series of arguments contending that we should revisit our holdings in *Walsh* I.

Walsh first argues that we wrongly held that Washington common law applied to property acquired before the parties moved to Washington, asserting that community property principles did not apply to property acquired in California under California's statutory scheme at the time. In *Walsh* I, we held that the committed intimate relationship doctrine applied to property the parties had acquired in California because the "doctrine is a creature of common law, not statute," so there was no need for Washington and California to have "substantially equivalent" community property rights schemes under RCW 26.60.090. 183 Wn.2d at 844-45. We reasoned that, prior to our legislature's statutory recognition of domestic partnerships in 2008, "Washington courts recognized a common law [committed intimate relationship] in a 'stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist.'" *Id.* at 845 (quoting *Long*, 158 Wn. App. at 925).

Indeed, by its very nature as a form of equitable relief, the committed intimate relationship doctrine applies in the absence of a statutory basis for equitable distribution of property upon the dissolution of an equitable relationship. A fundamental underpinning of the controlling cases is that the doctrine applies even where a statute would not recognize comparable rights. *See Vasquez*, 145 Wn.2d at 107 ("Equitable claims are not dependent on the

'legality' of the relationship between the parties."); *Pennington*, 142 Wn.2d at 602 ("We have never divorced the meretricious relationship doctrine from its equitable underpinnings."); *Olver*, 161 Wn.2d at 668 ("[A]n inability to legally marry did not preclude an equitable claim per se, and each claim had to be evaluated on its facts."). Walsh cannot show that *Walsh* I was clearly erroneous in the face of the long line of committed intimate relationship case law. Moreover, Walsh conflates the issue in *Walsh* I, whether a committed intimate relationship existed before January 1, 2005, with the separate issue, addressed below, of whether certain property should be characterized as separate or community-like.

Walsh also argues that we misapplied the *Long* factors because *Long* involved different facts than this case. However, the fact that *Long* involved different factual circumstances does not mean that its broad principles were not applicable to Walsh and Reynolds's relationship. Washington courts consistently apply the factors discussed in *Long* to determine whether a committed intimate relationship exists given the specific facts of the case. *See Connell*, 127 Wn.2d at 346; *Muridan*, 3 Wn. App. 2d at 58-59. The fact that this case is in some ways factually distinguishable from *Long* does not mean it was clearly erroneous to uphold the trial court's initial finding of a committed intimate relationship under the *Long* factors.

Walsh then argues that, in order to distribute property under a committed intimate relationship analysis, the parties must have entered into an implied contract. She claims we ignored this issue in her initial appeal and that there was no implied contract between her and Reynolds to characterize their assets as community-like property. However, the committed intimate relationship doctrine has never treated an implied contract as a precondition. Instead it is premised on the notion that the parties' actions and the factual circumstances of their

15

relationship imply a marital-like relationship under common law subject to equitable distribution. *See Connell*, 127 Wn.2d at 346-47.

Finally, Walsh asserts that *Walsh* I improperly extended community property rights to apply to committed intimate relationships. Although community property law does not apply *directly* to such relationships, it is well established that courts look to the statutory definitions of "separate" and "community property" for guidance in proceedings such as these. *See Muridan*, 3 Wn. App. 2d at 56 n.4; *see also Connell*, 127 Wn.2d at 351. Furthermore, "[a]ll property considered to be owned by both parties is before the court and is subject to a just and equitable distribution" during dissolution of a committed intimate relationship. *Connell*, 127 Wn.2d at 351. It was not clearly erroneous to apply community property principles.

In sum, Walsh has not established that *Walsh* I was erroneously decided and we decline to revisit our holdings in that case. We accordingly assess whether the trial court's ruling on remand improperly contradicted *Walsh* I.

C.     The Trial Court Violated the Law of the Case

In *Walsh* I, we held: "We reverse the trial court's property distribution and remand to the trial court (1) *to reconsider whether the parties had a common law* [*committed intimate relationship*] *before January 1, 2005*; and (2) *if so*, to redistribute the parties' community assets accordingly." 183 Wn. App. at 859 (emphasis added). Walsh focuses exclusively on this language to argue the scope of remand. But the trial court should not have read this language in a vacuum. In the course of the *Walsh* I decision, we also made clear that the parties' committed intimate relationship necessarily began before 2005.

We began our opinion in *Walsh* I with a summary of our holdings, including:

16

> We reverse the trial court's finding that this [committed intimate relationship] began only in 2005 and remand to the trial court to reconsider and to amend its finding about when the parties' [committed intimate relationship] began and then to reassess its equitable distribution of community property based on this finding.

*Id.* at 835.  Later, we said that we agreed with Reynolds that the trial court erred in ruling that the relationship commenced in January 2005.  *Id.* at 841.  We held that the parties' committed intimate relationship began "at least as far back as the January 1, 2005 date the trial court chose. . . . *We also hold, however, that the trial court erred in limiting application of the* [*committed intimate relationship*] *doctrine to only the 4½ years before the parties registered in Washington*."  *Id.* at 847 (emphasis added).  We explained our reasoning and holdings clearly:

> *We see no reason why the five* [*Long*] *factors that the trial court applied to the parties' post-2005 relationship should not also apply to their pre-2005 domestic partnership relationship in California*, which, as the trial court here expressly recognized, involved continuous cohabitation for 'approximately 23 years' in a relationship for which the purpose was 'to create a family' while 'holding themselves out to the world as a family.'  Suppl. CP at 411.  Throughout their relationship, both Walsh and Reynolds 'contributed their time and energy to . . . raising . . . their family' and to 'joint projects,' with 'no doubt that they intended to live together as a family.'  Suppl. CP at 411.  *We hold, therefore, that the trial court should have extended application of the [committed intimate relationship] doctrine to the parties' relationship before 2005,* including their registered domestic partnership under California's act, *an unimpeachable indicator* of the intended nature of their relationship.

*Id.* at 847-48 (emphasis added) (footnote omitted).  We again reiterated this reasoning later in the opinion:

> The findings of fact and the record do not support the trial court's legal conclusion that the parties' [committed intimate relationship] began no earlier than 2005. . . . [T]he trial court failed to consider the common law and its application to the parties' [committed intimate relationship] that existed before California's 2005 statutory recognition of such relationships, *despite explaining that had Walsh and Reynolds been a legally recognized heterosexual marriage, it would not have 'hesitate[d] to find that a [committed intimate relationship] existed for the 20 plus years prior to the date of the marriage*.'  Suppl. CP at 412.  Thus, we remand to the trial court to consider the extent of the parties' [committed intimate relationship] during this

earlier pre-2005 period, to apply the five *Long* factors to this portion of their relationship, and to revise its property distribution accordingly.

*Id.* at 851-53 (emphasis added).

In addition, we also recognized there was substantial evidence that the parties "intended to be in a marriage-like relationship with a shared purpose," including evidence of their "permanency planning, shared love and intimacy, adopting and raising children as a couple, extended family relationships, caring for one another when sick, providing financial and nonfinancial support for each other and their children, and holding themselves out as a couple." *Id.* at 846-47.

We conclude that the trial court erred on remand by declining to determine at what point before January 1, 2005 the committed intimate relationship began.

IV. THE TRIAL COURT'S LEGAL ERRORS

While failure to follow the law of the case alone warrants reversal in this case, the trial court also committed additional legal errors that warrant discussion to avoid recurrence on remand. First, the trial court applied the wrong legal framework in its committed intimate relationship analysis. Second, the court assumed a constitutional barrier to finding a committed intimate relationship existed prior to 2005 when there was none.

A. The Trial Court Misapplied the Legal Framework for Committed Intimate Relationships

1. The trial court conflated the determination of when the committed intimate relationship began with the determination of whether property acquired during the relationship was community-like or separate.

Washington courts have treated the existence of committed intimate relationship and the characterization of property that the couple has acquired as two questions, but the trial court conflated them. *See Connell*, 127 Wn.2d at 349. The trial court relied too heavily on the issue of

18

whether the parties intended some or all of their property to stay separate property when purportedly deciding whether a committed intimate relationship existed under the *Long* factors.

Consistent with *Connell* and *Walsh* I, a trial court must determine the whether a committed intimate relationship existed and if so, when it began. Only then must the court characterize the property acquired during the relationship as community-like or separate. In doing so, the trial court must apply the presumption that property acquired during the relationship was community-like property subject to equitable distribution. *See id.* at 351.

If a party has claimed that the parties agreed to maintain their property as separate property, then the trial court must determine whether the evidence of an agreement to keep property separate was sufficient to overcome the presumption. *G.W.-F.*, 170 Wn. App. at 634. The court must also evaluate whether any separate property agreement has been performed, and if so, assess the agreement for procedural and substantive fairness. *Id.*

While the *Long* factors include whether the parties pooled their resources during the relationship, this factor is not determinative of whether a committed intimate relationship existed at all. *See id.* at 642-43. Using the court's assessment of the character of property acquired during the relationship as the driving factor to determine the existence of a committed intimate relationship would put the cart before the horse.

2. The trial court's conclusion that there was no committed intimate relationship prior to 2005 is not supported by the facts of this case.

We review whether substantial evidence supports the trial court's findings of fact and whether those findings support the trial court's conclusions of law. *Walsh* I, 183 Wn. App. at 841. The trial court's conclusion on remand that there was a committed intimate relationship

after January 1, 2005, but not before, is not supported by the trial court's findings or by the record.

After the first trial, the trial court summarized its findings on the *Long* factors: (1) except for a few brief interruptions, the parties cohabitated from 1988 until 2010, (2) their physical intimacy ceased in 1994, except for a brief time in 2007, (3) the purpose of the relationship was to create a family, though the parties' commitment was to the children and not to each other, (4) although Walsh was the sole financial provider, the parties contributed their time and energy to raising their family and jointly remodeled the Federal Way home, and (5) the parties intended to live together as a family but maintain separate assets and liabilities, with limited exceptions such as the Federal Way property and one family car. We upheld these underlying findings as supported by substantial evidence, concluding only that the trial court improperly determined when the committed intimate relationship began. *Id.* at 846.

On remand, the court summarized its findings on the *Long* factors with respect to the parties' pre-2005 relationship, in a similar way. The trial court added findings that the parties' relationship was not "marital-like," based on the fact that Walsh paid Reynolds for housekeeping and childcare and the parties stopped being physically intimate after their second child was born in 1994. CP at 771.

None of the reasons the trial court offered for finding no committed intimate relationship before 2005 articulates what about the relationship was *factually* different after 2005. The trial court identified only that California law changed, effective in 2005.

The record shows that both pre- and post-2005, the parties continuously cohabited since 1988, had the shared purpose to raise a family, and jointly contributed to raising their family

20

together. According to the testimony, their physical intimacy ended sometime between 1993 and 1995, not in 2005. Walsh began making payments to Reynolds far earlier than 2005. And the parties titled some property separately from the beginning of their relationship. There is simply nothing in the trial court's factual findings or in the record to suggest the *factual* circumstances of the parties' relationship changed or matured to some significant degree on January 1, 2005. Thus, the trial court's conclusion that the committed intimate relationship did not begin until 2005 is not supported by its findings or by the record.

Like we did in *Walsh* I, we hold again that the trial court erred in finding that no committed intimate relationship existed prior to 2005.

3. The trial court's reason for declining to find a committed intimate relationship before 2005 based on California law is untenable.

In *Walsh* I, we took particular note of the trial court's statement that had the parties "been a legally recognized heterosexual marriage, it would not have 'hestitate[d] to find that a [committed intimate relationship] existed for the 20 plus years prior to the date of the marriage.'" 183 Wn.2d at 853 (quoting CP at 412). Treating a same sex couple differently is inconsistent with the case law about committed intimate relationships applying the doctrine to same sex couples. *See Vasquez*, 145 Wn.2d at 107. "Equitable claims are not dependent on the 'legality' of the relationship between the parties, nor are they limited by the gender or sexual orientation of the parties." *Id.*

Moreover, the trial court's specific justification for choosing January 1, 2005 as the

21

cutoff date for the parties' committed intimate relationship is not supported by law.[3]  The trial court reasoned that it could not find such a relationship before 2005 because under the applicable California law, the parties would not have expected a community property presumption to apply to them.

But California common law has long recognized the application of equitable principles to division of property in nonmarital relationships.

> In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties.  The courts may also employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case.

*Marvin v. Marvin*, 18 Cal.3d 660, 665, 557 P.2d 106 (1976).

As early as 1986, the California Court of Appeals applied the principles from *Marvin* to uphold the trial court's equal division of property following the termination of the parties' nonmarital relationship.  *Alderson v. Alderson*, 180 Cal. App. 3d 450, 225 Cal. Rptr. 610 (1986). The Court of Appeals held it was proper for the trial court to divide the parties' property equally because there was ample evidence that they "impliedly agreed to share equally in their acquisitions," including that the parties held themselves out as a married couple and pooled their resources, time, and energy to purchase and maintain properties.  *Id.* at 461.  And California courts have accepted at least as far back as 1988 that there is no legal distinction between

---

[3] The court's reasoning that finding a committed intimate relationship existed prior to 2005 would violate Walsh's constitutional rights, and Walsh's corresponding argument on appeal, are addressed below.

heterosexual and same sex relationships in this context. *See Whorton v. Dillingham*, 202 Cal. App. 3d 447, 452 n.1, 248 Cal. Rptr. 405 (1988).

Therefore, we conclude that California law did not prevent the application of community property principles to the parties' pre-2005 relationship.

In sum, Reynolds has established that the trial court erred as a matter of law in its application of the committed intimate relationship doctrine. In addition to failing to follow the law of the case, it misapplied the legal analysis established in case law by conflating the application of the *Long* factors with the characterization of property acquired during the relationship. And the facts do not support its conclusion that application of the *Long* factors results in a different finding pre- and post-January 1, 2005. Finally, the trial court's understanding of California law was inaccurate.

B.      There Were No Constitutional Barriers to Finding a Committed Intimate Relationship Before 2005

The trial court declined to find a committed intimate relationship existed prior to 2005 in part on the grounds that doing so would violate the parties' constitutional rights. In her cross-appeal, Walsh argues that transferring her separate property to Reynolds is unconstitutional under the takings, due process, and equal protection clauses of the federal and state constitutions.

As an initial matter, Reynolds argues that Walsh has no constitutionally protected vested right to her "separate" property because regardless of whether the property is characterized as separate or community-like, all property owned by either party is subject to equitable distribution under RCW 26.09.080. But RCW 26.09.080 only applies to registered domestic partnerships, and the parties did not register their partnership in Washington until 2009. *See* RCW 26.60.080 ("Any community property rights of domestic partners . . . shall apply from the date of the initial

23

registration of the domestic partnership or June 12, 2008, whichever is later.").  With respect to property acquired during the parties' committed intimate relationship, only property characterized as community-like property is subject to equitable distribution.  *Connell*, 127 Wn.2d at 352.

> 1.  Application of the committed intimate relationship doctrine does not violate the takings clause.

Walsh first argues that transferring her property to Reynolds via the committed intimate relationship doctrine constitutes a judicial taking under both federal and state constitutions.  The takings clauses of both the United States and Washington constitutions prevent government from taking property from one private party for the sole purpose of giving it to another.  *Kelo v. City of New London*, 545 U.S. 469, 477, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005); WASH. CONST., art. I, § 16 ("Private property shall not be taken for private use.").  However, we have not recognized that this prohibition extends to the judiciary's power to redistribute property through equitable relief or other means.  To extend the takings doctrine in such a manner would seemingly call many common law equitable doctrines into question.

Walsh argues that the United States Supreme Court recognized a judicial takings doctrine in *Stop the Beach Renourishment, Inc. v. Florida Dep't of Environmental Protection*, 560 U.S. 702, 725, 130 S. Ct. 2592, 177 L. Ed. 2d 184 (2010).  However, that portion of the opinion was only a plurality; the other four justices who heard the case were not prepared to embrace the doctrine that the judicial branch is subject to the takings clause.  *Id.* at 733-34 (Kennedy, J., concurring in part); *id.* at 745 (Breyer, J., concurring in part).  There being no federally recognized judicial takings doctrine, we reject Walsh's argument that the court's equitable distribution of the parties' property constituted an unconstitutional taking under federal law.

Moreover, Walsh has not presented any cases where a Washington court has applied a judicial takings doctrine in the context of equitable distribution of property following dissolution. Our Supreme Court has recognized a judicial taking in the context of a court order requiring encroachers to pay a property owner in exchange for the encroached-upon land, rather than ejecting the encroachers. *See Tyree v. Gosa*, 11 Wn.2d 572, 580-82, 119 P.2d 926 (1941). However, the court more recently retreated from *Tyree*, clarifying that a trial court's authority to craft the type of relief invalidated in *Tyree* is not outright prohibited by property rules such as the takings clause. *Proctor v. Huntington*, 169 Wn.2d 491, 500-01, 238 P.3d 1117 (2010).

Walsh has not shown that the takings clause in any way limits a trial court's authority to order equitable distribution of assets following the dissolution of a domestic partnership or committed intimate relationship. Any proceeding to dissolve a marriage, domestic partnership, or committed intimate relationship may involve distributing assets that one party personally considers to be separate from the couple's joint property, yet it does not appear that any federal or Washington court has found a court-ordered equitable distribution of property to constitute a "taking." We reject Walsh's argument.

2. Application of the committed intimate relationship doctrine does not violate due process.

Walsh also argues that equitable distribution of her property violates the due process clauses of the federal and state constitutions. She contends that the application of Washington common law to distribute property she previously acquired in California essentially deprives her of a vested right to property without due process of law. She relies on an assertion that, at the time she acquired those assets, she could not have reasonably expected that they would someday be subject to equitable distribution under Washington common law.

Walsh has not cited any case where a court recognized a violation of due process on these grounds. She instead cites Justice Kennedy's concurrences in *Stop the Beach Renourishment.* 560 U.S. at 737 ("a judicial decision that eliminates or substantially changes established property rights, which are a legitimate expectation of the owner, is 'arbitrary or irrational' under the Due Process Clause") (quoting *Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 542, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005)); *Eastern Enterprises v. Apfel*, 524 U.S. 498, 548, 118 S. Ct. 2131, 141 L. Ed. 2d 451 (1998) ("If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership.").

But to prevail on this theory, Walsh would have to establish the application of the committed intimate relationship doctrine affected her vested rights. *See In re Pers. Restraint of Carrier*, 173 Wn.2d 791, 810-11, 272 P.3d 209 (2012). A vested right "'must be something more than a mere expectation based upon an anticipated continuance of the existing law.'" *Id.* at 811 (quoting *Godfrey v. State*, 84 Wn.2d 959, 963, 530 P.2d 630 (1975)). Walsh has not established she had more than a "mere expectation" that distribution of assets upon termination of their relationship would be governed by a property regime more favorable to her. *Id.*

By the time Walsh and Reynolds made the choice to move to Washington, it was already well established here that community-like property principles applied to "stable, marital-like relationship[s] where both parties cohabit with knowledge that a lawful marriage between them does not exist." *Connell*, 127 Wn.2d at 346. Although Washington courts did not explicitly recognize the applicability of this doctrine to same sex couples until the following year, *see*

26

*Vasquez*, 145 Wn.2d 103, due process does not prevent application of changes in the common law where no party's vested rights are affected.  *See Carrier*, 173 Wn.2d at 810-11.

Although California law may control the character of the property acquired before the parties moved to Washington, *Smith*, 158 Wn. App. at 259, the character of the property is a distinct inquiry from the issue of whether and when a committed intimate relationship existed. *See Connell*, 127 Wn.2d at 349.  Walsh will have an opportunity to overcome the presumption that property acquired during the relationship is community-like.  Once the trial court has validly determined the duration of the committed intimate relationship, then it can apply the presumption, characterize the parties' property, and determine whether the parties intended any property to remain separate property.  *See G.W.-F.*, 170 Wn. App. at 634.  This process preserves Walsh's right to argue about her expectation that some property remained her separate property. For these reasons, it cannot be said that she is being deprived of her property without due process of law.  We reject Walsh's due process argument.

3.  Application of the committed intimate relationship doctrine does not violate equal protection.

Walsh next argues that equitable distribution violates equal protection.  She claims that the court's property distribution deprives her of property based on her sexual orientation.  She reasons that "only same-sex couples will face the prospect of having private property taken from them and redistributed without any compensation or due process in return."  Br. of Resp't at 23.

Walsh seems to have this analysis exactly backwards.  Rather than distinguishing between same sex and opposite sex couples, the committed intimate relationship doctrine treats them the same.  And our Supreme Court has made clear that equitable distribution does not apply only to those relationships that could have shared the benefits of marriage but chose not to, as

Walsh suggests. *See Vasquez*, 145 Wn.2d at 107. The parties' dissolution in this case is subject to the same equitable distribution scheme that would apply to any heterosexual couple in their situation. Walsh's equal protection claim is without merit.

In sum, we reject all of Walsh's constitutional arguments.

## V. THE TRIAL COURT'S ALTERNATIVE DECISION THAT THE PARTIES AGREED TO MAINTAIN ALL PROPERTY AS SEPARATE PROPERTY

The trial court made an alternative finding that the parties agreed to maintain all of their property as separate property. It found that, even if a committed intimate relationship existed as far back as 1988, there was nevertheless "clear, cogent and convincing evidence" that the parties formed "an agreement for each party to acquire and maintain separate property." CP at 748. The court noted that Walsh paid Reynolds compensation for her household chores and childcare, which Reynolds treated as income for tax filing purposes; the parties had no joint accounts; the parties titled each of their vehicles in their own name, with the exception of the vehicle they intended to be a family vehicle. The court reasoned that parties to a committed intimate relationship, like spouses or registered domestic partners, "can change the status of their community-like property to separate property by mutual agreement." CP at 748. Relying on *G.W.-F.,* 170 Wn. App. at 636, Walsh also argues to this court that the parties had an enforceable agreement to retain separate ownership of certain property.

Reynolds contests the trial court's finding that the couple's property was separate in character. Reynolds argues first that Walsh failed to raise this issue earlier in the first trial. However, it is clear from the record that Walsh has always maintained that she and Reynolds carefully kept their finances and assets separate. We therefore consider whether the trial court's

28

alternative finding provides an independent basis for upholding the trial court's property distribution, despite the legal errors described above. We conclude it does not.

Upon finding the existence of a committed intimate relationship, the court must presume that all property acquired during the relationship is community property subject to equitable distribution. *Connell*, 127 Wn.2d at 351. In *G.W.-F.*, the trial court found that, despite the presence of committed intimate relationship, the parties had formed, and performed, an enforceable oral agreement regarding their separate and community-like property. 170 Wn. App. at 636. Division One affirmed, reasoning that "[p]artners in a committed intimate relationship, like spouses, may change the status of their community-like property to separate property by entering into mutual agreements." *Id.* at 638. The court explained that there was ample evidence from the record in that case to rebut the presumption that the parties' property acquired during the relationship was community-like property, as the parties avoided commingling their individual and joint assets for the entirety of their 25-year relationship. *Id.* at 639-40. The court held there was substantial evidence from both parties' testimony that they had agreed they would each contribute equally to the payment of their joint household and childcare expenses while keeping their incomes separate. *Id.* at 640-41.

The trial court here has not yet properly determined the time period of the parties' committed intimate relationship, and so has not yet properly characterized all the property acquired during the relationship. As a part of this characterization of the parties' property, the trial court must apply the presumption that all property acquired during the relationship is community-like property. We cannot affirm the trial court's finding that the parties' property remains separate without proper application of the presumption in favor of community-like

29

property acquired during the committed intimate relationship. *See In re Estate of Langeland*, 177 Wn. App. 315, 331, 312 P.3d 657 (2013) ("Because the court failed to apply the correct presumption to property acquired during the [parties'] committed intimate relationship, we reverse and remand for the trial court to reconsider the proper distribution of the jointly acquired assets."), *review denied*, 187 Wn.2d 1010 (2017).

In addition, the trial court incorrectly concluded that treating certain property as community-like would violate the constitution because of Walsh's expectation that the property would remain hers. The characterization and distribution of property should be established without the impact of an incorrect understanding of constitutional limitations.

VI. ADDITIONAL ISSUES

A.     Remand to a Different Judge

Reynolds argues that we should remand this case to a different judge. We may remand to a different judge if we conclude from the record and the history of this case that "a just and expeditious resolution" would be best served by doing so. *GMAC v. Everett Chevrolet, Inc.*, 179 Wn. App. 126, 154, 317 P.3d 1074 (2014). We so conclude and therefore order that this case be remanded to a different trial judge.

On remand, the new trial judge will have the discretion to order a new hearing or rely on the transcripts of the prior trials in this case for the purpose of determining the appropriate pre-2005 start date for the parties' committed intimate relationship and characterizing their property for distribution.

B.    Attorney Fees

1. Attorney fees on remand

Reynolds argues the trial court improperly denied her request for attorney fees on remand.  We disagree.

Attorney fees in a dissolution proceeding are based on need and ability to pay.  RCW 26.09.140; *In re Marriage of Terry*, 79 Wn. App. 866, 871, 905 P.2d 935 (1995).  We review a trial court's attorney fee award for abuse of discretion.  *Kellar v. Estate of Kellar*, 172 Wn. App. 562, 591, 291 P.3d 906 (2012).  The party challenging a fee award bears the burden of showing it was "clearly untenable or manifestly unreasonable."  *Wash. State Commc'n Access Project v. Regal Cinemas, Inc.*, 173 Wn. App. 174, 219, 293 P.3d 413 (2013).

The trial court noted that it "considered need and ability to pay.  Ms. Reynolds has income and assets available to her to pay her own attorney fees and costs."  CP at 645.  We give great deference to the trial court in making these decisions, and Reynolds has not shown that the court's decision was "clearly untenable or manifestly unreasonable."  *Wash. State Commc'n Access Project*, 173 Wn. App. at 219.  We hold the trial court did not abuse its discretion in denying attorney fees on remand.

2. Attorney fees on appeal

Reynolds also argues we should award her attorney fees on appeal under RAP 18.9, on the grounds that her appeal is only necessary because the trial court violated the law of the case at the urging of Walsh.  Under RAP 18.9(a) we may award fees to a party who is harmed by either a delay caused by the other party's frivolous appeal or the other party's failure to comply by court rules.  But there is no indication that Walsh has failed to comply with any court rules

and her appeal is not frivolous. We hold Reynolds is not entitled to attorney fees under RAP 18.9.

However, RCW 26.09.140 provides an independent basis for awarding fees on appeal from the dissolution of a registered domestic partnership. "Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." RCW 26.09.140.

Washington courts have reasoned that, although they may analogize to the statutory regimes governing marriage for guidance in resolving the dissolution of committed intimate relationships, RCW 26.09.140 itself is still inapplicable to such relationships. *See W. Cmty. Bank v. Helmer*, 48 Wn. App. 694, 699, 740 P.2d 359 (1987); *Foster v. Thilges*, 61 Wn. App. 880, 887-88, 812 P.2d 523 (1991). But this case is not solely a committed intimate relationship proceeding. Although issues pertaining to the parties' pre-domestic partnership relationship were the only remaining issues on remand, this case still arose out of a domestic partnership dissolution proceeding under chapter 26.09 RCW. RCW 26.09.140 grants us discretion to award fees and costs on "any appeal" arising from a domestic partnership dissolution. As Reynolds is the prevailing party on appeal, we exercise that discretion to award her fees and costs associated with this appeal, with the specific amount to be determined by a commissioner of this court.

CONCLUSION

We reverse and remand for a different trial judge to enter findings consistent with the law of the case and the committed intimate relationship doctrine as articulated in this opinion. The trial court must determine when, prior to 2005, the committed intimate relationship began in accordance with our prior decision. The trial court must apply the presumption that all property

32

acquired during the committed intimate relationship is community-like. The court must then characterize the parties' property as either community-like or separate by applying that presumption and by considering whether the parties had an agreement to maintain separate property. The trial court must do so with the understanding that there is no constitutional barrier to applying the presumption to community-like property acquired during the committed intimate relationship. The trial court must then distribute the property accordingly.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Melnick, P.J.

Sutton, J.